was virtually nonexistent. The exclusion of the evidence undermines our confidence in the validity of the jury's verdict.

We thus reverse defendant's conviction and remand for a new trial.

738 A.2d 385

P.T., A.T. AND H.T., PLAINTIFFS–RESPONDENTS,
v. M.S., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued June 9, 1999—Decided October 21, 1999.

194

196

Before Judges STERN, BRAITHWAITE and WECKER.

*Christopher P. Gengaro,* argued the cause for appellants (*Lentz and Gengaro,* attorneys; *Mr. Gengaro,* of counsel and on the brief).

*Robert B. Gidding,* argued the cause for respondents.

*Steven R. Lane,* guardian ad litem, argued the cause for the minor (*Lane and Mantell,* attorneys; *Mr. Lane,* on the brief).

The opinion of the court was delivered by

WECKER, J.A.D.

Defendant, M.S., appeals from orders entered on July 10, 1998, and August 17, 1998, and portions of an order entered on January 13, 1999.[1]

This case is an example of a tragic but recurring dilemma in certain family court cases involving allegations of child sexual abuse. On the one hand, there are clearly cases of imagined or even fabricated charges against a parent, especially when raised during the pendency of divorce proceedings. For a parent to stand accused of such an offense is devastating both to that individual, and to the child's lifelong relationship with the parent. On the other hand, proof of such abuse, especially involving a very young child, is rarely clear, and the potential danger to a child from a reoccurrence, if the suspicions and accusations are well-founded, is enormous.

The thrust of the appeal is that the Family Part Judge erred in ordering (1) reunification of a child, A., with her father, plaintiff P.T., and with her paternal grandparents, plaintiffs A.T. and H.T.; (2) the start of unsupervised visitation; and (3) a change from sole to joint legal custody, all without ever conducting a plenary hearing on the child's best interests. Defendant, the child's mother, contends that the judge erroneously relied on a 1996 agreement resulting in a consent order that purportedly waived such a hearing and ceded the court's authority to an appointed expert psychologist.

Defendant also appeals from the determination that she is in contempt of court and in violation of plaintiffs' litigants' rights by obstructing the reunification process, and ordering her to pay plaintiffs' attorneys' fees as a sanction. Finally, defendant seeks a remand and reassignment to another judge. We agree with essentially all of defendant's contentions.

---

[1] To the extent that defendant's appeal from any of these orders may be deemed interlocutory, as plaintiffs suggest, we grant leave to appeal *nunc pro tunc*.

As a result of our review of the extensive record, we are convinced that the orders appealed from must be reversed. Specifically, we reverse the orders changing sole custody in M.S. to joint legal custody between M.S. and P.T., ordering reunification and unsupervised visitation to begin, and finding M.S. to be in violation of litigants' rights. We remand the case to the Family Part, to be assigned to a different judge, who shall within ninety days conduct a closed hearing to address questions surrounding the child's best interest, specifically, whether reunification with her father and her paternal grandparents, including supervised and unsupervised visitation, serves that interest, and if so, the conditions for proceeding.

This appeal reminds us of the limitations of judicial, legal, and psychology professionals in the face of unknowable private conduct between a parent and a child. Our courts are too frequently faced with such tragic conflicts, often contemporaneous with divorce proceedings, when one parent accuses the other of sexually abusing their child. The limitations of our ability to know the truth place us all, particularly the judge, on the horns of a dilemma. If the accusation is accurate, we must protect the child at all costs. On the other hand, if the accusation is inaccurate, the child's relationship with the accused parent will unnecessarily be impaired, if not destroyed, and the accused parent's reputation irreparably damaged. We recognize that an inaccurate accusation can result from an honest mistake, as well as a knowing fabrication. When the breakdown of the parents' marriage precedes the accusation, the truth-seeking process is even more complex. Particularly in the case of a very young child, whose verbal communication is limited, the truth is frequently impossible to discover. Medical experts tell us that physical examination of a young child is rarely conclusive, except in the most physically violent cases.

These introductory remarks are intended only to highlight the dilemma faced by any judge addressing a dispute over parental visitation in such circumstances. An appellate court attempting to review the record is at an even greater disadvantage, and general-

ly gives great weight, if not complete deference, to the facts found by the judge who has seen and heard the parties, the child, and both expert and lay witnesses. *See Palermo v. Palermo,* 164 *N.J.Super.* 492, 498–99, 397 *A.2d* 349 (App.Div.1978); *see also Rova Farms Resort, Inc. v. Investors Ins. Co. of America,* 65 *N.J.* 474, 484, 323 *A.2d* 495 (1974). Here, there was no plenary hearing, and we find such basic legal errors in the proceedings leading up to this appeal, that we are compelled to reverse and remand the matter to the Family Part, with instructions that the matter be assigned to a different judge.

We are faced here with a mother's appeal from sanctions imposed by a Family Part Judge as a result of the judge's finding that the mother did not comply with court orders to cooperate in the "reunification" of the parties' nine-year-old daughter with her father. The parents, divorced in June 1995, had separated several years earlier as a direct result of adjudicated incidents of domestic violence. Visitation with the father, plaintiff P.T., was barred as a result of allegations of sexual abuse of this child.

The child, A., now ten-years old,[2] has lived all her life with her mother and an older half-brother and half-sister. Except for several supervised visits with her father in 1994 or 1995, and again in the fall of 1998, A. has had no contact either with her father or his parents[3] since 1993. Since that time, M.S. and P.T., along with P.T.'s parents, A.T. and H.T., various therapists, guardians ad litem and the court, have been embroiled in a continuing battle over whether and how the child should be reunified with her father and her parental grandparents, and whether the mother has unjustifiably impeded reunification. The court proceedings, however, have focused far more on whether the mother has

---

[2] A. was born August 11, 1989.

[3] The grandparents' application for visitation was joined with P.T.'s divorce action and post-judgment proceedings. Plaintiff's mother, A.T., and his father, H.T., are therefore plaintiffs as well.

violated various interlocutory orders respecting the procedure for reunification, than on determining what is best for the child.

The record is replete with evidence that M.S. was the victim of P.T.'s physical violence during their brief marriage. The record also provides evidence that the psychologists and guardian ad litem who interacted directly with A. from 1993 through 1995 found reason to believe that she had been sexually abused by her father. The record also includes P.T.'s denials. Recognizing that the facts surrounding these allegations have not been (and likely never can be) determined with certainty, we are convinced nevertheless that this background has been unfairly excluded from the 1998 proceedings leading up to the determination that M.S. violated plaintiffs' rights.

## I. FACTUAL AND PROCEDURAL HISTORY

Some details of the history are essential to understanding our decision. In June 1991, when A. was not quite two years old, P.T. filed a complaint for divorce against M.S. P.T. pled guilty to assaulting M.S., and a permanent restraining order under the Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25–1 *et seq.*, was entered against him.

### A. *The Allegations of Sexual Abuse*

In December 1992, when A. was almost three and one half, M.S. contacted a mental health clinic, reporting and requesting an evaluation of A.'s descriptions of sexual abuse by P.T. The evaluating therapist[4] who treated the child at M.S.'s request concluded, in a March 1993 report to the Division of Youth and Family Services ("DYFS"), that A. had been sexually abused by her father. As part of the investigation of the sexual abuse charge, a pediatrician examined A. and reported no physical evidence of sexual abuse, but explained that because any visible

---

[4] Amy L. Kavanaugh, Staff Psychologist with the Community Mental Health Center of Somerset County.

trauma associated with the kind of contact the child reported would have healed within fourteen days, the results of her physical examination were inconclusive.

DYFS and the Somerset County Prosecutor's office thereafter concluded that the allegations could not be substantiated, because A.'s interviews were inconsistent and she was insufficiently communicative. However, as a result of defendant's allegations, the court terminated P.T.'s visitation with A. Visitation was continued with P.T.'s parents. The court then appointed Dr. Madeline Simring Milchman to conduct an independent psychological evaluation of the allegations and submit a report to the court. The court also appointed Amy Shimalla, Esq., as guardian ad litem for A.

Dr. Milchman conducted extensive interviews with the parties, including joint sessions involving A., both parents, and P.T.'s parents, H.T. and A.T. Dr. Milchman also interviewed M.S.'s two older children, A.'s nursery school teachers, and a babysitter, and filed a detailed, 129–page report in July 1994. A. reported to Dr. Milchman that "daddy" touched her "private" and her "heiny" many times, and in several sessions she gave additional details. Dr. Milchman concluded that sexual abuse probably had occurred.

A.'s statements about her grandparents were less explicit, but she did say that they threatened her "if she told." Dr. Milchman concluded that these allegations should be considered seriously.

Dr. Milchman found P.T.'s behavior during joint sessions with his daughter inappropriate, in that he demanded physical contact with A. He resented Dr. Milchman's injunctions to respect A.'s wishes and to refrain from explicitly denying allegations of abuse in her presence. Dr. Milchman noted P.T.'s apparent lack of self-control, and reported that A. was "consistently frightened and withdrawn" during the joint sessions with her father. She concluded that M.S. was not attempting to alienate A. from her father, since A. was more willing to interact with him in the presence of her mother than in her mother's absence. Dr. Mil-

chman found no evidence that M.S. had planted the allegations of sexual abuse with A.

Dr. Milchman reported that during joint sessions with P.T.'s mother and father, A. was friendly with her grandfather, but appeared frightened of her grandmother and withdrew from her. Dr. Milchman evaluated A.T. as controlling and hostile, with a high capacity for denial. She evaluated P.T. as aggressive, unable to deal with reality, and as having a "serious mental disturbance."

Dr. Milchman concluded that A. suffered from "symptoms of post-traumatic stress disorder with content-specific symptoms of sexual trauma." She recommended that contact between A. and P.T. should be suspended until her post-traumatic symptoms subsided. She recommended that all the parties should receive therapy, that any contact between A. and either P.T. or A.T. should occur only on recommendation of their respective therapists, and that supervised contact between H.T. and A. could be "considered."

Dr. Gerald Cooke, a psychologist retained by plaintiffs, reviewed and provided a written critique of Dr. Milchman's report, but never interviewed any of the parties. Dr. Cooke could not determine whether A. had been abused or not, and opined that future evaluations would "probably contribute little because of the confounding of the previous evaluations."

In May 1995, Amy Kavanaugh, A.'s psychologist, reported that A. had had negative symptoms, including enhanced anxiety and sleep difficulty, after visits with her father and paternal grandparents. Kavanaugh recommended against resuming visitation at that time.

In June 1995, Amy Shimalla, the court-appointed guardian, submitted her own report. She recommended that M.S. receive physical custody of A. She also recommended against joint legal custody on the ground that P.T.'s aggressiveness and the past history of the couple would prevent effective cooperation on matters relating to A.'s best interest. Shimalla adopted the

recommendations of both Dr. Milchman and Kavanaugh that visitation would not be appropriate until P.T. could refrain from challenging A. about her beliefs as to the abuse. Shimalla recommended therapy for P.T. to help him achieve this goal.

### B. *The 1995 Divorce Judgment and 1996 Consent Order*

On June 28, 1995, the final judgment of divorce provided for defendant to have sole custody of A., for P.T. to pay child support,[5] and for efforts at reunification of A. with her father and parental grandparents,[6] by the parties' agreement, to be entrusted to a family therapist, Dr. Elaine Weitz.

The reunification process apparently was not working, and on May 24, 1996, the Family Part Judge ordered the custody and visitation issues restored to the trial calendar. The judge found defendant in violation of litigants' rights with respect to the reunification plan and stated that a plenary hearing and custody and visitation would be held.

In a report dated November 5, 1996, Shimalla referred to Dr. Weitz's report that M.S. had been having problems accepting the restoration of a relationship between A. and P.T., and that P.T. had stopped attending sessions. Shimalla recommended that a more detailed consent order be adopted providing for individual therapy for M.S., A., and P.T.

On November 12, 1996, instead of a plenary hearing on the parties' respective charges against each other, a consent order was entered which provided that Dr. Weitz would supervise individual therapy for M.S., for P.T. and his parents, and for A., and could appoint "outside" therapists for them.[7] Dr. Weitz was given "sole

---

[5] The record before us does not include any history with respect to P.T.'s child support payments.

[6] The judgment also consolidated the grandparents' action for visitation with the ongoing proceedings between P.T. and M.S.

[7] We are disturbed by the broad delegation of power that allowed Weitz to appoint other therapists associated with or employed by her own counseling

authority" and "sole control" over the process, including complete discretion to determine when the process had advanced to the point where reunification sessions between A. and her father and grandparents could take place. The order explicitly provided that Dr. Weitz's decisions and recommendations were not to be reviewed by the court, and she was not to be called "as a witness in any proceeding with respect to [matters occurring] in sessions." The parties were ordered to "participate in the sessions with Dr. Weitz in good faith and without reservation, and [to] comply with all decisions and recommendations made by Dr. Weitz." The parties were to pay for their own sessions, and P.T. and defendant were to share the costs of A.'s sessions equally.

## C. *Finding M.S. in Violation of Litigant's Rights*

In October 1997, plaintiffs moved for an order holding defendant in violation of the 1996 consent order, claiming that M.S. had impeded the reunification process.

In a report filed with the court in January 1998, Dr. Weitz related that the team of therapists she had appointed did not recommend reunification at that time, primarily, according to Dr. Weitz, because of A.'s belief that her father had hurt her, and her fear of him. As a secondary reason, Dr. Weitz stated that because M.S. believed that P.T. had harmed A., she would "unconsciously sabotage" the process, and attempts at reunification would put stress on A.'s relationship with her mother.

Hearings on plaintiffs' motion to find defendant in violation of the consent order were held on January 13, February 10, and February 18, 1998. Dr. Weitz testified that supervised visitation did not present any threat to A., and that she had communicated this to the parties. The court did not allow M.S.'s attorney to

---

group to work with the individual parties and the child, and then allowed Dr. Weitz (as the "team leader") to report those therapists' recommendations to the court. The relationship between Weitz and the other therapists raises a question whether truly independent counseling, or an objective evaluation and recommendation, can be expected of the several therapists.

inquire into the basis for that finding, on the ground that the only issue before the court was the parties' compliance with the court's orders. Dr. Weitz stated that the team had not discussed unsupervised visitation, and when plaintiffs' counsel attempted to inquire whether Dr. Weitz was optimistic about the prospects of safe unsupervised visitation, the court disallowed the question as "premature." The team made no specific findings with respect to the grandparents.

Much of the testimony related to defendant's financial difficulty in meeting Dr. Weitz's advance payment requirements, the eventual resolution of that problem, and the resumption of scheduled sessions. M.S. had been unable to meet the payment schedule, and Dr. Weitz had stopped the sessions with A. until the payments were received. Defendant confirmed that she had told Dr. Weitz at one point that she did not have the funds to make full payment immediately, but that she would make the payment; this apparently prompted Dr. Weitz to cancel scheduled sessions and to call and write to the court. At the time, defendant had approximately $80 per month in disposable income after meeting roof and other essential expenses for herself and three children. M.S. testified that as long as her insurance company was paying the percentage it was required to pay, she anticipated being able to pay the balance. However, in January 1997 she had had trouble paying the $200 deductible "for that calendar year." Her sister had paid the outstanding balance for her in February 1997. However, sessions did not resume immediately; the therapists scheduled the next sessions several weeks hence. After biweekly rather than weekly sessions were scheduled, defendant made timely payments. By agreement with the therapists, she paid the insurance deductible, and the therapy center accepted the balance from the insurance company. Some delay also was caused by defendant's desire to coordinate her sessions with A.'s, a desire the court agreed was reasonable.

■ It was error on this evidence to hold that M.S.'s problems paying for and scheduling reunification sessions violated plaintiffs'

rights, and to order monetary sanctions, without evidence or a finding that the payment or scheduling problems were unjustified and willful.

Testifying at the *R.* 1:10 hearing with respect to the substance of the reunification process, Dr. Weitz confirmed her report that M.S.'s attitude toward P.T. would hinder reunification by putting stress on her relationship with A. Dr. Weitz also stated that A. had referred to her father as a "bad man," and that this description probably came from defendant. Dr. Weitz found that A.'s resistance to the process was unusual, and related that she and the other therapists believed that there was a message being communicated to A., "perhaps not overtly," that she should not have a relationship with her father.

M.S. had told the therapist chosen for her by Weitz that she found it hard to believe that P.T. was not a threat, and that she wanted to hear that he took responsibility for his actions. She once stated to A.'s therapist, in front of A., that "A. is having a very hard time coming here." M.S.'s therapist had expressed concern that the intensity of defendant's emotions inadvertently would be communicated to A. The therapist related that M.S. had a "manipulative" style of relating to others, but was not so acting in "a malicious way or an intentional way." None of the other therapists (among the team appointed by Weitz) testified.

M.S. testified that she had been supportive of A. during the therapeutic process, comforting her when she became anxious. When A. did not want to go to sessions, M.S. made her go, although A. got "hysterical." A. had begun to get more upset after June 1997; following that, M.S. did not talk to A. about her father at all, because that "would just upset her even more." M.S. had "put her faith" in Dr. Weitz and the team, and had not tried to substitute her beliefs for the therapists. However, she had become concerned, because she remained convinced that A. could not safely have contact with her father. There is no dispute that M.S. attended all scheduled sessions and brought A. to all sessions scheduled for her.

The court rejected several of plaintiffs' allegations against M.S., finding that the modification of session schedules and that M.S.'s request to schedule her sessions at the same time as A.'s were reasonable, that there was insufficient evidence that defendant had shown A. a certain videotape on sexual abuse, and that there was insufficient evidence that defendant had referred to P.T. as a "bad man" in front of A.

The court nevertheless found that defendant had violated the consent order in several respects: (1) by her failure to make timely payments, because she had "no legitimate excuse for non-payment of the bill, and that this was evidence of her failure to proceed in good faith [with the consent order]" . . .; (2) by not accepting the conclusions of the therapists that P.T. did not present a danger to A.; and (3) by failing to support the goal of reunification and influencing her daughter "by her conduct, attitude, and demeanor," thus hindering the reunification process. The court found that M.S.'s relationship with A. was "manipulative" and "enmeshed," and stated that the report and testimony of Dr. Weitz indicated that M.S.'s attitude was the chief obstacle to reunification. The court cited Dr. Weitz's statement that M.S. might unconsciously sabotage the process, and then stated that:

> However, I am not so generous as to find that this was done unconsciously . . . I find that she consciously and intentionally, defiantly and contemptuously refused to accept this court's order and abide by the terms of her own settlement.
>
> . . .
>
> Her entering into the agreement given her mental state and her unwillingness to ameliorate her views, her firm views of A.'s best interest constitutes a violation of [the order].

The court noted that M.S. had apparently never affirmatively told A. that it was safe to see her father, and stated "I cannot find the words to express my view that [defendant] has utterly and completely failed as a mother to meet her child's best interest." We are not satisfied that the record supports the judge's extremely harsh view of M.S.'s role.

## D. *The Orders on Appeal*

As a result of the hearing in January and February, by Order of July 10, 1998, the court held defendant in violation of litigant's rights, appointed a new guardian ad litem,[8] and ordered the guardian's fees paid by M.S. However, the court severely restricted the guardian's role, which was itself undefined. The new guardian, Stephen Lane, Esq. ("Lane"), was not permitted to receive any documents generated before June 29, 1995. Nor were any of the allegations of domestic violence or sexual abuse to be considered by him.[9] He was directed to accept as binding the "finding by Dr. Weitz that P.T. and H.T. and A.T. do not pose any risk, emotional or physical, to A., and that they are fit to have unsupervised visitation alone or together, with A." Dr. Weitz, we note, had not actually made such findings with respect to *un*supervised visitation with P.T., nor with respect to his parents, H.T. and A.T. The July 10 order scheduled a further hearing for August 1998, purportedly to address visitation, and ruled that only Dr. Weitz could testify, and only if she chose to do so. M.S. was ordered to pay plaintiffs' counsel fees for having to bring the *R.* 1:10 motion.

On August 3, Lane submitted a report to the court, relating Dr. Weitz' opinion that the reunification process now could go forward, with supervised reunification sessions between A. and P.T. to continue for about a month, the grandparents to be included for another month, and then unsupervised visitation could begin.

Lane also reported speaking to M.S., who expressed her view that A. needed further therapy before reunification could occur. Lane also spoke to plaintiffs, who claimed that defendant had brainwashed A., and that A. should have unsupervised visitation with them. Lane then recommended the progression of visits that

---

[8] We find nothing in the record to explain why Shimalla was no longer serving as guardian ad litem.

[9] At oral argument before us, Lane confirmed that it would have been helpful had he been given access to the full record of the case, beginning in 1993.

Dr. Weitz had suggested, subject to change at the discretion of Dr. Weitz. Lane further recommended that P.T. be given A.'s school and medical records and authorization to communicate directly with school and medical personnel about A., and that M.S. should provide P.T. with all of A.'s photographs, and all school and medical records in her possession. Lane recommended that P.T. and M.S. be permitted to communicate with each other on matters concerning A.

At the August 5, 1998 hearing, contemplated by the July 10 order, Dr. Weitz did not testify. Instead, she submitted a letter to the court stating that she agreed with Lane's recommendations, and that she remained willing to oversee the reunification process. At the hearing, Lane stated that his recommendations were based on his view of A.'s best interest. He had never spoken to A., because Dr. Weitz advised him that it would not be in the child's best interest; however, Weitz gave him no reason for that advice. Lane could not recall whether Dr. Weitz had relayed anything about actual contact with A., or about A.'s therapy sessions. He assumed that Dr. Weitz had communicated with A.'s therapist, Patricia McManus,[10] but did not know this for certain. Lane recommended against a transfer of custody to P.T. at that time.

The judge stated that it was inappropriate to consider the issue of whether child abuse took place, because the parties had waived the right to a decision by agreeing to the 1996 consent order. The court adopted the Lane/Weitz recommendations for reunification sessions, adding orders that M.S. undergo therapy to be paid for by her; that Dr. Weitz designate a counselor to work with A., the costs to be shared between the parties; and that Dr. Weitz submit reports every thirty days from the beginning of the sessions.

---

[10] Ms. McManus, a licensed clinical social worker whose name appears on the letterhead of Dr. Weitz's professional association, began counseling with A. in January 1997. The record does not reveal when or why A.'s counseling with Amy Kavanaugh was discontinued.

On August 17 the court entered an order *sua sponte*, which provided for the first time for P.T. and M.S. to share joint legal custody of A. M.S. was forbidden from inquiring into the substance of the reunification sessions, but was required to tell A. that she supported the process, and would be held responsible for insuring that A. attended the sessions. M.S. was to be subject to sanctions, including incarceration, if she did not cooperate. The parties were forbidden to disparage each other, or discuss allegations of sexual abuse, in A.'s presence. The order stated that the court retained jurisdiction to determine custody and parenting time, and that Dr. Weitz's judgment would no longer be binding. M.S. was ordered to pay plaintiffs' counsel fees and the fees of the guardian.[11] The court stayed the execution of the order to allow M.S. to seek relief from us.

We find error in the judge's refusal to allow the new guardian ad litem to examine the record related to the mother's pre-judgment accusations against the father, including the several experts' reports and a prior guardian's report, all of which give credence to the good faith of the mother's accusations and continued fears for the child. We do not suggest that a good faith belief that the court's decision was mistaken excuses willful non-compliance with court-ordered visitation. However, the record suggests that the trial judge may have given insufficient credibility to M.S.'s explanations and continuing, understandable concerns about reunification.

E. *Since August 1998*

On August 20, 1998, M.S. filed a Notice of Appeal, and on September 17, she applied to us for an emergent stay of the reunification process. We denied the application without preju-

---

[11] According to plaintiffs' statement of facts, an order was entered on September 8, 1998, requiring M.S. to pay plaintiffs' legal fees in the amount of $10,000. This order does not appear in the record, and is not designated in M.S.'s supplemental notice of appeal.

dice to M.S.'s future right to apply for a stay of unsupervised visitation.

In October 1998, M.S. apparently moved before the trial court for a plenary hearing prior to the institution of any unsupervised visitation. That motion was denied, and in January 1999 the trial court, pursuant to a recommendation from Dr. Weitz, ordered the first unsupervised visit between A. and her father. M.S. again moved for a hearing in the Family Part prior to the first unsupervised visit, alleging that the supervised visitation had been causing difficulty for A. In its ruling of January 12, 1999, the trial court stated that although defendant would normally be entitled to a hearing, the parties' 1996 agreement (embodied in the consent order) precluded the court's involvement. Despite the August 1998 order providing that Dr. Weitz's previously "binding" decisions now would be subject to court "supervision," the trial court refused to review Dr. Weitz's decision to allow unsupervised visitation.

On January 13, 1999,[12] M.S. applied to us for an emergent stay of unsupervised visitation; we granted a one-day stay, pending argument the following day. The Family Part Judge then submitted a supplemental opinion to us, stating that he was doing so because plaintiffs' were not then represented by counsel,[13] and reiterating his view that M.S. had waived her right to a hearing by entering into the agreement that resulted in the 1996 consent order. Plaintiffs failed to appear for argument on January 14, and we therefore ordered that the stay of unsupervised visitation would remain in effect. On February 1 P.T. moved in the trial court to suspend the reunification process pending resolution of this appeal. P.T. also moved for an order clarifying our January 14 decision, which we denied by order of March 5. In response to

---

[12] On January 7, we denied P.T.'s motion for summary disposition of this appeal.

[13] Plaintiffs were represented at all hearings and were represented at oral argument on this appeal.

M.S.'s motion, we continued the temporary stay of unsupervised visitation pending disposition of this appeal.[14]

## II. ORDERING VISITATION AND A CUSTODY CHANGE WITHOUT A PLENARY HEARING—THE AUGUST 17, 1998 AND JANUARY 13, 1998 ORDERS

When the August 17, 1998, order was entered, P.T. had not seen A. for four or five years, and had not been alone with her since the first abuse allegations. Before ordering reunification sessions to begin, the court failed to hold a plenary hearing, failed to consider submissions from both parties on the issue of A.'s best interest, and never interviewed the child. The court apparently based its decision on the newly-appointed guardian's hearsay recitation of a conversation with Dr. Weitz, and a letter from Dr. Weitz confirming those recommendations. Neither the judge nor the guardian had ever interviewed the child.

In her January 4, 1998, report to the court, referring to a September 1997 telephone conference with the attorneys for the parties, Dr. Weitz had said:

I explained to the attorneys that *the primary reasons the team recommended against reunification* were that [A.] believed her father hurt her, she became increasingly anxious and distressed as discussion of her father ensued, and that her prognosis for adjusting to reunification was poor. A secondary reason was because [M.S.] would not allow [A.] to accept her father back into her life. This was presented to the attorneys as a clinical issue. The team consensus was that [A.] would be traumatized by contact with her father, in part, because of the stress it would put on her relationship with her mother. That relationship was defined as intense and enmeshed, but stable and secure. The team also concluded that if reunification were recommended, it was plausible that [M.S.] would unconsciously sabotage the process because of her strong and unwavering beliefs that [P.T.] was a danger to her daughter. *With regard to the court order, none of the therapists had evidence that [M.S.] had directly undermined the terms of settlement [M.S.] was never given a directive or recommendation by her therapist or myself to support reunification.*

[Emphasis added.]

14 We accelerated the appeal, and ordered M.S. to submit a supplemental Notice of Appeal. She did so on May 12, 1999.

Weitz was not required to testify prior to the entry of the August 17 order, and she never submitted or explained the grounds for her change of position: that reunification now should go forward. At the 1998 hearing at which Dr. Weitz did testify, when the issue was defendant's violation of litigant's rights, defendant was prevented from examining Dr. Weitz regarding the basis for her finding that P.T. did not present a danger to A. in supervised visitation, or her predictions about future unsupervised visitation.

Other than Dr. Weitz' participation in the *R.* 1:10 hearing in early 1998, we see nothing in the record to account for her August 1998 recommendation to Lane, and by letter to the court, that A.'s reunification with her father (and grandparents) should now proceed. Notwithstanding the absence of such findings, the court directed the Guardian to accept as binding a purported "finding by Dr. Weitz that [P.T.] and [H.T. and A.T.] do not pose any risk, emotional or physical, to A., and that they are fit to have unsupervised visitation alone or together, with A."

 Where visitation issues are disputed, or where a plenary hearing would assist the court in deciding on a visitation plan, such a hearing should be held. *Fusco v. Fusco,* 186 *N.J.Super.* 321, 327, 452 *A.*2d 681 (App.Div.1982)(incarcerated father sought visitation with his children at the prison). Even where the parties have waived a hearing, " 'the matter of visitation is so important, especially during the formative years of a child ...,' [that] 'a plenary hearing must be required' " if it would assist the court in making its determination. *Fusco,* 186 *N.J.Super.* at 327, 452 *A.*2d 681 (quoting *Wagner v. Wagner,* 165 *N.J.Super.* 553, 555, 398 *A.*2d 918 (App.Div.1979), *certif. denied,* 85 *N.J.* 93, 425 *A.*2d 260 (1980)). To make such a decision based upon conflicting lay and expert certifications "without an evidential basis, without examination and cross-examination of lay and expert witnesses, and without a statement of reasons is untenable in the extreme." *Fusco,* 186 *N.J.Super.* at 327, 452 *A.*2d 681.

In *Fusco,* the issue was *supervised* visitation in a highly controlled setting, and there were no allegations that the father had

abused the child. Here, by contrast, the issue was both supervised and unsupervised visitation, in a situation where there had been allegations of sexual abuse that had not been discredited.

Parties cannot by agreement relieve the court of its obligation to safeguard the best interests of the child. *See In re Baby M.,* 109 *N.J.* 396, 418, 537 *A.*2d 1227 (1988), *reversing* 217 *N.J.Super.* 313, 525 *A.*2d 1128 (Ch.Div.1987). The Supreme Court, while holding the *Baby M.* surrogacy contract invalid, nevertheless agreed with the trial judge's implied holding that the surrogacy contract was irrelevant to the determination of custody, and that "beyond the best interest of the child, 'all other concerns raised by counsel constitute commentary.' " 109 *N.J.* at 418, 537 *A.*2d 1227 (quoting *In re Baby M.,* 217 *N.J.Super.* at 323, 525 *A.*2d 1128.) While custody agreements should be taken into account by the court, *see Wist v. Wist,* 101 *N.J.* 509, 512–513, 503 *A.*2d 281 (1986), a trial court must determine whether the agreement is in the best interests of the children. In *Wist,* the Court found the disputed issues minimal, *id.* at 512, 503 *A.*2d 281, and enforced the parties' agreement. *See also Giangeruso v. Giangeruso,* 310 *N.J.Super.* 476, 478–79, 708 *A.*2d 1232 (Ch.Div.1997) (holding invalid as a violation of public policy an agreement that the children need not have contact with the new "love interests" of the parties if they did not wish to do so). In issues of custody and visitation " '[t]he question is always what is in the best interests of the children, no matter what the parties have agreed to.' " *Id.* at 479, 708 *A.*2d 1232 (quoting *Hallberg v. Hallberg,* 113 *N.J.Super.* 205, 209, 273 *A.*2d 389 (App.Div.1971)).

In this case, there have been allegations of child sexual abuse, and the 1996 consent order improperly relieved the court of its very power to determine what is in the child's best interest and improperly delegated unreviewable decision-making power to a third party. Although not directly on appeal, we find no support for such an order, which delegates unbridled, final, nonreviewable authority to a psychologist to make decisions about visitation and custody.

In the August 17, 1998, order, the Family Part Judge appeared to modify that portion of the 1996 consent order that relinquished the court's authority over Dr. Weitz. However, that modification was one of form and not substance, because the judge denied defendant's January 1999 request for a hearing on unsupervised visitation on the ground that the parties had agreed in 1996 to non-involvement by the court.

The burden of decision-making in the face of such a conflict is one of the heaviest any judge faces. There being no litmus test for truth, we understand the temptation to place too much reliance upon experts. For a discussion of the important role of independent expert evaluation to assist the court in custody and visitation cases, *see Kinsella v. Kinsella,* 150 *N.J.* 276, 318–20, 328, 696 *A.*2d 556 (1997). Nevertheless, we cannot allow experts to shoulder excess responsibility or authority, nor trial judges to cede their responsibility and authority. The court must not abdicate its decision-making role to an expert. *See Matter of Guardianship of J.C.,* 129 *N.J.* 1, 22, 608 *A.*2d 1312 (1992) (noting that expert opinion is part of a "complete and balanced presentation of all relevant and material evidence sufficient to enable [the court] to make a sound determination consistent with the child's best interest.") *Cf. In re Registrant G.B.,* 147 *N.J.* 62, 87, 685 *A.*2d 1252 (1996) (noting that for purposes of sex offender registry, courts must take "care not to abdicate decisionmaking responsibility to experts"); *In re D.C.,* 146 *N.J.* 31, 59, 679 *A.*2d 634 (1996) (noting same for purposes of involuntary commitment proceedings).

The judgment of divorce provided for M.S. to have sole custody of A. In its order of August 17, 1998, the court *sua sponte* awarded joint legal custody to P.T. The issue of joint legal custody had not previously been raised by the parties. If the decision to establish visitation required a plenary hearing, the custody change without holding a hearing and interviewing the child was certainly error. *See Mackowski v. Mackowski,* 317 *N.J.Super.* 8, 11, 721 *A.*2d 12 (App.Div.1998); *G.C. v. M.Y.,* 278

*N.J.Super.* 363, 368, 651 *A.*2d 110 (App.Div.1995); *R.* 5:8–6. The first guardian ad litem, Amy Shimalla, advised against joint legal custody on the ground that the parties would not be able to cooperate on matters relating to A. *See also N.J.S.A.* 9:2–4c (requiring that in deciding custody issues, the court shall consider "the parents' ability to agree, communicate and cooperate in matters relating to the child....") The court at the time apparently accepted Shimalla's recommendation that the parties' inability to cooperate made joint custody inappropriate. Nothing in the record suggests that cooperation had become any more likely, or joint custody more appropriate. Quite the contrary. Before the court awarded joint legal custody to P.T., evidence of changed circumstances was required. *Beck v. Beck,* 86 *N.J.* 480, 496 n. 8, 432 *A.*2d 63 (1981); *Mastropole v. Mastropole,* 181 *N.J.Super.* 130, 136, 436 *A.*2d 955 (App.Div.1981).

Although the Supreme Court in *Beck* upheld a trial court's *sua sponte* order of joint legal custody, the trial judge had held an evidentiary hearing and found that joint custody was in the best interests of the children. *Id.* at 492–93, 432 *A.*2d 63. "The necessity for at least minimal parental cooperation in a joint custody arrangement presents a thorny problem of judicial enforcement" in cases where such cooperation is apparently absent. *Beck,* 86 *N.J.* at 499, 432 *A.*2d 63. Before this court ordered a change to joint legal custody, it should have heard all relevant evidence, given the parties the opportunity to argue the matter, and made findings as to the appropriateness of such an arrangement. *See Beck,* 86 *N.J.* at 489, n. 4, 432 *A.*2d 63. The record before us does not support such a finding. The court here erred in *sua sponte* modifying the original custody arrangement, and the joint legal custody order must be vacated.

We recognize that M.S. may be an obstacle to A.'s relationship with her father, and it may be in A.'s best interest for reunification to proceed. But we cannot find sufficient support in this record for those conclusions, and the trial court did not reach its conclusions in an appropriate manner, after a full hearing and a

direct interview with the child. Moreover, M.S. cannot be deemed to have waived A.'s right to a hearing by having entered into the unjustified 1996 order that Dr. Weitz's decisions would be "binding." Nor can a parent waive a best interest analysis prospectively and without regard to future circumstances.

### III. FINDING DEFENDANT IN VIOLATION OF LITIGANT'S RIGHTS—THE JULY 10, 1998 ORDER.

The determination that M.S. violated the consent order was based on findings that she had inexcusably failed to pay therapist's fees, thereby delaying the reunification process, and that she had violated the order by her attitude and manner of relating to A.

The record does not support the conclusion that M.S.'s failure to pay Dr. Weitz's fees was willful, or that she had the ability to pay the fees in full and in advance. The court made no findings as to M.S.'s ability to make payments, or the reasonableness of the payment arrangements Dr. Weitz demanded. The court simply stated that there was no legitimate excuse for the earlier failure. Moreover, M.S. testified that during the period in question she did not have the funds to pay in full and in advance. No evidence was introduced to rebut M.S.'s evidence that her own financial means were limited, and that the outstanding balance was paid by her sister in February 1997. Finally, M.S. did work out a payment arrangement with Dr. Weitz's team, and made the payments due under that arrangement.

The finding that M.S. was in violation of litigants' rights was apparently predicated in large part upon the conclusion that the consent order required M.S. to change her subjective view of P.T.'s prospective visitation with A. The court stated that M.S.'s "entering into the agreement given her mental state and her unwillingness to ameliorate her views, her firm views of A.'s best interest constitutes a violation of the consent order."

The provisions of the 1996 consent order that require the parties to "participate in the sessions with Dr. Weitz in good faith

and without reservation, and [to] comply with all decisions and recommendations made by Dr. Wietz," cannot reasonably require the parties to change their opinions and forsake their subjective fears. The court has the power to control and punish conduct, not thoughts.

The court explicitly found insufficient evidence to establish certain of plaintiffs' allegations; and the court did not find any specific prohibited conduct by M.S. Nevertheless, the court concluded that M.S.'s manner of relating to A. had violated the court's order. The court noted that M.S. had not affirmatively reassured A. that it was safe to see her father, but there was no evidence that Dr. Weitz or any of the therapists instructed M.S. to do so. While there was circumstantial evidence suggesting that M.S.'s subjective fears may have been unconsciously transmitted to A., there was no evidence that M.S. willfully engaged in conduct calculated to subvert the goal of reunification.[15] Most important is that in the fall of 1997, as reported earlier in 1998, Dr. Weitz's team made a finding that reunification was not yet appropriate.

Where a Family Part Judge's findings are supported by sufficient credible evidence, we must defer to those findings. *See Cesare v. Cesare*, 154 *N.J.* 394, 412–13, 713 *A.*2d 390 (1998); *see also Walles v. Walles*, 295 *N.J.Super.* 498, 513, 685 *A.*2d 508 (App.Div.1996). Here, however, the court's findings that M.S. violated litigant's rights are not supported by substantial, credible evidence. We see no indication that the court considered evidence that M.S. was cooperating with her first husband, the father of her two older children, in maintaining their relationship, and in maintaining the older children's relationship with their paternal grandmother. Moreover, the court's emphasis on the fee issue in the *R.* 1:10 hearing was misplaced. The motion to enforce litigants'

---

[15] Attached as Appendix A to this opinion is a March 11, 1998 memo from Patricia A. McManus, L.C.S.W., the therapist appointed by Dr. Weitz to work with A. The memo does not support the finding that M.S. violated any court orders.

rights was brought in the Fall of 1997, and the court's decision after the early 1998 plenary hearing was not delivered until July. Relief by way of motion to enforce litigants' rights under *R.* 1:10–3 is "not for the purpose of punishment, but as a coercive measure to facilitate the enforcement of [a] court order." *Ridley v. Dennison,* 298 *N.J.Super.* 373, 381, 689 *A.*2d 793 (App.Div.1997). The July 1998 order suggests a punitive and not a coercive rationale. The record reveals a legally and financially punitive approach to M.S., an approach that cannot benefit A. or the prospects for A.'s reunification with her father or paternal grandparents. We therefore reverse those portions of the orders of July 10 and August 17 that hold M.S. in violation of litigants' rights and impose sanctions and counsel fees on M.S.

## IV. THE REMAND

We are satisfied that further proceedings in this case require a fresh judicial examination. *R.* 1:12–1(f) provides for disqualification when "there is any ... reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so."

> While not strictly a matter of disqualification, the appellate court has the authority to direct on a remand by it that a different judge consider the matter in order to preserve the appearance of a fair and unprejudiced hearing. *See, e.g., Carmichael v. Bryan,* 310 *N.J.Super.* 34, 49, 707 *A.*2d 1357 (App.Div.1998).
>
> [Pressler, *Current N.J. Court Rules,* comment 5 on *R.* 1:12–1.]

In *In re Baby M.,* 109 *N.J.* at 463 n. 19, 537 *A.*2d 1227, the Court remanded the issue of visitation with the child's biological mother to a different judge. The original trial judge had never reached the visitation issue because he had concluded that the mother's parental rights should be terminated. The Supreme Court cited the trial judge's "potential 'commitment to its findings,'" (quoting *New Jersey Div. of Youth and Family Servs. v. A.W.,* 103 *N.J.* 591, 617, 512 *A.*2d 438 (1986)), and "the extent to which a judge 'has already engaged in weighing the evidence[.]'" (quoting *In re Guardianship of R.,* 155 *N.J.Super.* 186, 195, 382 *A.*2d 654 (App.Div.1977)). In *A.W.,* the Court remanded a termi-

nation of parental rights case to a different trial judge for rehearing, because the original trial judge had given weight to inappropriate factors and "has heard this evidence and may have a commitment to its findings." 103 *N.J.* at 617, 512 *A.*2d 438. We find similar circumstances here.

This court also has remanded cases to be heard by a different judge on several occasions. *See, e.g., J.L. v. J.F.,* 317 *N.J.Super.* 418, 438, 722 *A.*2d 558 (App.Div.1999)(citing *R.* 1:12–1(d) and remanding to a different trial judge because the original judge had found a party's position not credible); *Carmichael v. Bryan,* 310 *N.J.Super.* 34, 49, 707 *A.*2d 1357 (App.Div.1998)(remanding to a different trial judge because the original judge had made findings about a party's intent).

In this case, the trial judge stated that M.S.'s attitude was clearly the chief obstacle to reunification. He also found that M.S. "consciously and intentionally, defiantly and contemptuously refused to accept this court's order." It is because we find these conclusions insufficiently supported by the evidence in the record, that we order the reassignment. The judge's statements went considerably beyond what was needed or necessary to resolve the issue at hand, and cast doubt upon the realistic possibility of an impartial hearing before the same judge on remand. Because the judge has taken a strong (though undoubtedly sincere) view of the merits of this case, we conclude that insuring the appearance as well as the reality of an impartial hearing requires that the case be reassigned.

We hasten to note that in the normal course of litigation, a trial judge's findings of fact, including findings regarding the credibility of parties, and findings under *R.* 1:10 that a party has violated a court order, do not warrant reassignment. We find the facts and procedural history here sufficiently unique that a fresh look may benefit all parties—most of all, the child.

It may well be a practical impossibility ever to determine whether P.T. had any inappropriate sexual contact with A. We do not suggest that further attempts at judicial fact-finding on that

issue should be undertaken. Nevertheless, the contemporaneous reports of various experts, and specifically those of Dr. Milchman, should be a factor in evaluating the good faith of M.S. in her conduct with respect to reunification, particularly as to unsupervised visitation.

We reverse the orders of July 10 and August 17, 1998, and January 13, 1999, and vacate the order finding M.S. in contempt of court and in violation of litigants' rights and ordering her to pay plaintiffs' fees and costs in connection with their *R.* 1:10 motion. We remand the matter for assignment to a different judge for a closed hearing to be conducted within ninety days, to determine whether and how the reunification process should resume, *i.e.,* whether P.T. and/or his parents should resume visitation, and if so, the nature and extent of visitation, consistent with the best interests of the child.

The proceedings on remand must include the judge's interview with A., who is now ten years old. *Compare R.* 5:8–6, requiring such an interview where custody is in dispute. We note that if A. has developed a trusting relationship with a qualified therapist, continued access to that person may afford her some protection against harmful interactions, and may also be of some reassurance to M.S.

The assigned judge shall have discretion to determine whether any of the experts who have previously submitted reports, and whether the child's therapist or any therapist who has worked with any of the parties, shall report to or testify before the court. We have some concern that Dr. Weitz's therapeutic role in any reunification process has been damaged by the role she has played in the financial aspect of the *R.* 1:10 hearing, as well as in direct counseling with P.T. However, because the benefits flowing from continuity of treatment may outweigh our concerns, we leave to the assigned judge the structure and content of further proceedings and expert appointments.

## APPENDIX A

To: The Honorable

From: Patricia A. McManus, L.C.S.W.

Date: March 11, 1998

Re: T_____ v. S

This report will answer the questions outlined in the letter issued to Elayne Weitz, Psy.D. on February 25, 1998. It is my understanding that the following questions are to be used in establishing whether or not Ms. S_____ is in violation of the November 2, 1996 order.

My clinical work with A_____ T_____ began in January 1997 and ended in September 1997. In answering question (a), I am not aware that at any time Ms. S_____ disparaged Mr. T_____ or the T_____ family. On only one occasion, Ms. S_____ remarked that A_____ cried on her way to a therapy session, because she did not like coming to therapy. However, Ms. S_____ made no disparaging remarks about Mr. T_____ or the T_____ family in my presence. During A_____'s treatment sessions, A_____ never shared that her mother (Ms. S_____) made disparaging remarks about Mr. T_____ or the T_____ family. A_____ consistently shared from her own experience and not once made influence to information obtained or heard from her mother. Regarding question (b), it is my opinion that Ms. S_____ participated in good faith and without reservation. Sessions were suspended early in treatment because Ms. S_____ was reportedly unable to afford weekly sessions. In March 1997, the issue appeared to be resolved and biweekly sessions commenced. With this commencement of sessions, Ms. S_____ was not initially happy with the scheduling but always brought A_____ to her scheduled sessions on time and without reservation. This scheduling issue was also resolved once Ms. S_____'s therapist (Ms. Schwartz) and I were able to give Ms. S_____ and A_____ same day evening appointments. When seen in the waiting room with A_____, Ms. S_____ was always respectful and positive about treat-

ment, telling A_____ that is was "ok" and to "go have fun with Patty." I feel this information also answers question (c). In sum, in my presence, Ms. S_____ remained supportive to A_____ during the treatment period.

Regarding discussions with Ms. Laura Schwartz relating to the coordination of sessions, Ms. S_____ and I worked together to give Ms. S_____ and A_____ sessions that were accommodating to Ms. S_____. This took some time to arrange after the treatment had been initially suspended, but Ms. S_____ never failed to bring A_____ to sessions. By late spring we were able to accommodate Ms. S_____ with sessions times. Also, concerning advice or recommendations from myself to Ms. Schwartz in order to help A_____ toward the goal of reunification, I can say that no recommendations were made to or discussed with Ms. Schwartz. It is my understanding that therapy was initiated to assess A_____'s emotional well being and whether or not reunification was in her best interest. This assessment was a long process as it took may sessions to engage with A_____ and earn her trust. It did not seem appropriate to begin exploring recommendations regarding reunification prior to knowing if reunification was in A_____'s best interest.

Sincerely,

/s/ Patricia A. McManus
Patricia A. McManus, L.C.S.W.