**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4738-17T2

L.V.B.,

    Plaintiff-Appellant,

v.

L.A.D.B.,

    Defendant-Respondent.

_____

Submitted January 30, 2019 – Decided May 16, 2019

Before Judges Vernoia and Moynihan.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0846-13.

The DeTommaso Law Group, LLC, attorneys for appellant (Andrew M. Shaw, on the brief).

Respondent has not filed a brief.

PER CURIAM

Plaintiff L.V.B. (Lana) appeals from those parts of the Family Part judge's order granting enforcement of the parenting time schedule contained in the matrimonial settlement agreement (MSA) she entered into with defendant L.A.D.B. (Luis), which was incorporated in the August 2013 final judgment of divorce, and denying her cross-motion to require Luis to attend therapy prior to the resumption of parenting time.[1] Lana also contends the motion judge denied her constitutional right to due process by sua sponte requiring the parties to mediate her request for Luis's contribution toward the costs of "tutoring, Portuguese school, and one sports activity per season per child" for the parties' two daughters instead of deciding that issue. Luis, who appeared pro se before the motion judge, has not filed any response to Lana's appeal. Because the trial court did not conduct a plenary hearing and improperly required the parties to mediate Lana's cross-motion request for contribution toward the girls' extracurricular activities, we reverse and remand.

I.

We first address the parenting time issue. The MSA provided that Lana would have custody of the girls – who were four and three years-old at the time

---

[1] We use pseudonyms to refer to the parties and their family members to protect their privacy and preserve the confidentiality of these proceedings. R. 1:38-3(d)(13).

of the divorce – and that Luis would have "reasonable rights of parenting time with their children every other weekend from Saturday morning at 9 a.m. to Sunday at 7 [p.m.]." Luis, who claimed he had not seen the children since January 1, 2018, moved in late-April 2018[2] to enforce the MSA's parenting time schedule and requested telephonic contact with the children "in the two weeks [he had] to be away from them." Lana opposed the motion, cross-moved for a suspension of Luis's parenting time until he attended therapy and provided evidence that he was "in treatment for his bipolar disorder," attended a parenting skills program and followed the therapist's recommendations.

The parties appeared before the motion judge on May 30, 2018. Luis requested an adjournment so he could gather additional information. The motion judge said he denied that request because the parties could not agree to a new date "for a few months" but "want[ed] to give [Luis] the opportunity to provide to the [c]ourt and [c]ounsel what he would normally put in a reply certification." The judge agreed to accept Luis's proffer of a letter from the Division of Child Protection and Permanency (the Division), parts of which he

---

[2] We have not been provided with a filed copy of the notice of motion. Defendant set forth April 23, 2018 as the date he signed the notice of motion, returnable on May 25, 2018, and supporting certification. Lana's certification in opposition was filed on May 16, 2018, two weeks prior to the entry of the motion judge's order.

read into the record. The judge also had both parties sworn but questioned only Luis. Following his questioning, the judge stated, "I didn't want to make this into a hearing, but I . . . wanted to get the information that I asked. But I am going to have [Lana's counsel] ask any follow-up questions that she deems appropriate." Lana's counsel cross-examined Luis. After some ensuing colloquy between the judge and both Luis and Lana's counsel, the judge said he would provide a decision. Lana was never questioned during the hearing.

In his written opinion, the judge concluded, "[t]he visitation schedule as outlined in the parties PSA is clear, and cannot be disturbed at this time" because "the sole basis for [Lana's] assertion . . . are uncorroborated allegations [that do] not rise to the level of changed circumstances." The judge's order enforced the MSA's custody agreement and denied without prejudice Lana's requests to condition parenting time on Luis's attendance to and compliance with therapy.

Our scope of review of Family Part orders is limited, as we accord deference to the family courts due to their "special jurisdiction and expertise" in family law matters. Cesare v. Cesare, 154 N.J. 394, 413 (1998). Therefore, the judge's findings are binding so long as its determinations are "supported by adequate, substantial, credible evidence." Id. at 412. A "[motion] judge's legal conclusions, and the application of those conclusions to the facts, are subject to

4

our plenary review." Spangenberg v. Kolakowski, 442 N.J. Super. 529, 535 (App. Div. 2015) (quoting Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

We recognize "in matrimonial matters . . . settlement agreements, being 'essentially consensual and voluntary in character[,] . . . [are] entitled to considerable weight with respect to their validity and enforceability' in equity, as long as they are fair and just." N.H. v. H.H., 418 N.J. Super. 262, 279 (App. Div. 2011) (alterations in original) (quoting Petersen v. Petersen, 85 N.J. 638, 642 (1981)). Absent fraud or coercion, a court is obligated to enforce the terms of the settlement agreement when entered into by "fully informed" parties. Avelino-Catabran v. Catabran, 445 N.J. Super. 574, 590 (App. Div. 2016); see also Quinn v. Quinn, 225 N.J. 34, 55 (2016). But if a party establishes a prima facie showing of changed circumstances, the court may alter the custody arrangement. Lepis v. Lepis, 83 N.J. 139, 157 (1980). Further, "[w]hile custody agreements should be taken into account by the court, a trial court must determine whether the agreement is in the best interests of the children." P.T. v. M.S., 325 N.J. Super. 193, 215 (App. Div. 1999) (citation omitted).

The parties' certifications and Luis's testimony at the hearing showed that both parties essentially agreed that circumstances had changed since they signed

the MSA.  Luis averred he was told by Lana and her mother, in January and February 2018, that the children – then eight and nine years-old – refused to come out of Lana's house when he came to pick them up for scheduled parenting time.  Lana asserted the children did not want to go with Luis.  She related that the children's school had called the Division after one of the girls "broke down" in school and complained about Luis's treatment of them.  Luis, during the court hearing, agreed that the school, not Lana, had called the Division.  Lana also contended Luis deviated from the MSA parenting time schedule by:  failing to contact or communicate with the children; returning the children after past visits to her mother's place of business in Hillside instead of Lana's home in Warren; and getting drunk and violently ill during parenting time on New Year's Eve and returning the children a day late.

Lana also complained Luis mistreated the girls during the marriage and after the divorce, including pinching both children.  Lana was concerned because Luis was diagnosed as bipolar and, during the marriage, refused to take prescribed medication.  She alleged Luis forced the children to take naps and bathe even though they showered just prior to them being picked up for parenting time.  She claimed Luis "would also sit and watch [the eight and nine year-old girls] while they bathed."

This record does not support the judge's conclusion that Lana's uncorroborated allegations did not establish changed circumstances. As we observed, both parties alleged the parenting time schedule set forth in the MSA was not adhered to. Further, during the hearing, when the judge asked Luis if he allowed the girls "to bathe themselves," Luis admitted he "only go[es] in there [to] ask her if she washed her things and that's it and then I shut off the water." The judge continued questioning:

> THE COURT: Is it a shower they're taking?
>
> [LUIS]: Yes, in the shower.
>
> THE COURT: So you –
>
> [LUIS]: Yes, in the shower. I'm sorry.
>
> THE COURT: – you turn off the water and turn on the water for them.
>
> [LUIS]: Yes.
>
> THE COURT: Okay.
>
> [LUIS]: As I had stated to [the Division social worker], on the report that she has, I put cream apply cream to the arms, chest, stomach or belly, legs, arms, but not to their intimate parts.
>
> THE COURT: Is that something . . . sun screen you're talking about?

[LUIS]: No, no, no, lotion. Lotion, like a hydrating cream, things like that.

THE COURT: All right. And is that . . . prescribed by a doctor?

[LUIS]: No.

THE COURT: All right. The girls are eight and nine. Is that correct?

[LUIS]: Uh-huh.

THE COURT: Did – I – I – I'm going to ask a question, are the girls eight and nine years old?

[LUIS]: Yes.

THE COURT: Don't you think they can do that themselves?

[LUIS]: But – yes, but they arrive – this to me is due to dirtiness, because of a dog that doesn't get a bath. With a frequent – minimal of frequency that also going to care – that they bathe the dog, so they arrive, she don't care. They arrive and I apply them like I have done all my life – all their lives. And they shower.

When the judge asked Luis to tell of his mental health history, Luis confirmed he went to a psychiatrist who "determined that . . . maybe [Luis] could be bipolar, but it was most likely the effects of stress" from overwork. Luis denied taking medications for any condition. When questioned by Lana's

A-4738-17T2

counsel, Luis admitted the doctor prescribed "anti-stress" medication but did not recall its name because "it's been over seven years ago."

These corroborated allegations are sufficient to meet Lana's threshold burden of showing changed circumstances which impact on the children's welfare.  See Todd v. Sheridan, 268 N.J. Super. 387, 398 (App. Div. 1993). Furthermore, they, and other disputed issues, required the motion judge to conduct a plenary hearing.

We recognize "[a]n inflexible rule requiring a plenary hearing" on every matrimonial application "would impede the sound administration of justice, impose an intolerable burden upon our trial judges, and place an undue financial burden upon the litigants."  Shaw v. Shaw, 138 N.J. Super. 436, 440 (App. Div. 1976).  "A plenary hearing is necessary[, however,] 'where a prima facie showing has been made that a genuine issue of fact exists bearing upon a critical question.'"  Bisbing v. Bisbing, 445 N.J. Super. 207, 216 (App. Div.), aff'd as modified, 230 N.J. 309 (2016) (quoting Barblock v. Barblock, 383 N.J. Super. 114, 123 (App. Div. 2006)).  We have explained:

> A court, when presented with conflicting factual averments material to the issues before it, ordinarily may not resolve those issues without a plenary hearing. While we respect the family court's special expertise, a court may not make credibility determinations or resolve genuine factual issues based on conflicting

affidavits. When the evidence discloses genuine material issues of fact, the failure to conduct a plenary hearing to resolve those issues requires us to reverse and remand for such a hearing.

[K.A.F. v. D.L.M., 437 N.J. Super. 123, 137-138 (App. Div. 2014) (citations omitted).]

Moreover, "a plenary hearing is particularly important when the submissions show there is a genuine and substantial factual dispute regarding the welfare of children." Id. at 138.

The record discloses several disputed issues that can be resolved by the court only after a plenary hearing. The judge read a letter from the Division – presented to the judge on the day of the hearing – which the judge said he would give to Lana's counsel before she left that day: "it states that the allegations against [Luis] [were] not established." Luis denied physically abusing the girls. The judge concluded that he could not find that Luis engaged in corporal punishment.

As Lana's counsel pointed out at the hearing, "[b]ecause there may not have been anything found at this point . . . does not mean that it didn't happen in the past." The judge erred by relying on the Division's conclusion stemming from a referral from the school – set forth in a report that was not provided to Lana until the hearing date – without analysis of the facts underlying the

10

allegations. Allowing Luis to submit the report at the hearing in lieu of filing a reply certification deprived Lana of the opportunity to respond to that issue.

Moreover, Luis's admissions that he entered the bathroom while one of the girls bathed, asked "if she washed her things," shut the water off and applied "cream to the arms, chest, stomach or belly, legs, arms, but not to their intimate parts," warranted further inquiry about the impact of Luis's actions on the children. The judge erred in concluding these allegations were not corroborated. He also erred in finding defendant's denial that he bathed the children credible. Although Lana's counsel was afforded an opportunity to cross-examine Luis, clearly counsel was not expecting the quasi-hearing the judge conducted. As Lana highlighted in her merits brief, the parties did not have a fair opportunity to prepare to address the issues in a full plenary hearing, including the presentation of evidence and witnesses. We determine the limited proceeding, without notice that it was evidentiary, did not provide a proper opportunity for the judge to assess credibility as tested through the rigors of cross-examination. J.G. v. J.H., 457 N.J. Super. 365, 372-73 (App. Div. 2019). Indeed, the motion judge said he "didn't want to make this into a hearing."

The judge called the allegations against Luis "disturbing." Indeed they are; they should be explored thoroughly. As the judge said at the start of the

hearing, "I have a general concern about allegations made against [Luis] that I have no way of knowing whether they're true or not." He told Luis, "I have some questions about . . . your mental health and your parenting skills." The judge's concerns and questions could not be answered by what was elicited at the informal hearing. A full plenary hearing should be conducted in order to resolve those issues. As Judge Wecker perspicaciously observed:

> The limitations of our ability to know the truth place us all, particularly the judge, on the horns of a dilemma. If the accusation is accurate, we must protect the child at all costs. On the other hand, if the accusation is inaccurate, the child's relationship with the accused parent will unnecessarily be impaired, if not destroyed, and the accused parent's reputation irreparably damaged.
>
> [P.T., 325 N.J. Super. at 199.]

Another issue that bears further inquiry at the plenary hearing is whether Luis, the girls or both should be involved in therapy. The judge determined: "Parenting therapy may very well be in the Luis's best interest in order to best foster a productive relationship with his daughters, however at this time the [c]ourt will not mandate that he undergo such treatment." No further explanation was given.

Generally, when courts are confronted with disputes concerning custody or parenting time, the court's primary concern is the best interests of the child.

See Sacharow v. Sacharow, 177 N.J. 62, 80 (2003); Wilke v. Wilke Culp, 196 N.J. Super. 487, 497 (App. Div. 1984). The court must consider "what will 'protect the safety, happiness, physical, mental and moral welfare of the child.'" Mastropole v. Mastropole, 181 N.J. Super. 130, 136 (App. Div. 1981) (quoting Beck v. Beck, 86 N.J. 480, 497 (1981)). In light of the circumstances presented in the record, we discern the judge's inclination about therapy was correct. A determination of that issue, under the best-interests-of-the-child lens, is required.

## II.

The motion judge denied without prejudice Lana's cross-motion to require Luis to pay fifty percent of the costs of the children's extracurricular activities "pending mediation."[3] The judge found the MSA was "silent regarding the allocation of the cost of extra-curricular expenses" but did "provide that the parties shall make all possible attempts to settle any disputes arising out of the [MSA] or performance thereof, before judicial intervention." The judge did not indicate whether the mediation involved an in-house mediation with a court

---

[3] Lana addresses only this economic ruling in her merits brief. Drinker Biddle & Reath, LLP v. N.J. Dep't of Law & Pub. Safety, Div. of Law, 421 N.J. Super. 489, 497 n.5 (App. Div. 2011) (noting issues not raised in appellant's merits briefs are deemed abandoned).

13

employee, a court-sanctioned mediation, see, e.g., Rule 5:5-6; Rule 1:40-5(b), or a more formal type.

The hearing did not address the economic issues which were the subject of Lana's cross-motion. Luis did not oppose Lana's request. We do not know if Luis would have addressed the issue if the judge had not denied his request for an adjournment. Because the issue was not raised during the hearing, Luis's position regarding the request is unknown. And neither party contended the matter should be mediated. In fact, mediation was never mentioned during the hearing; the parties had no opportunity to address whether mediation was appropriate.

The judge's determination, without any factual finding, was a legal conclusion to which we accord no special deference. Manalapan Realty L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). The MSA does not contain a mediation clause. Grafting such a clause on a provision that requires the parties to attempt to settle a dispute before resorting to the courts binds the parties to an agreement which they did not make. Levison v. Weintraub, 215 N.J. Super. 273, 276 (App. Div. 1987) ("We have no right 'to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently.'" (quoting Brick Twp. Mun. Util. Auth. v.

14

Diversified R.B. & T. Constr. Co., 171 N.J. Super. 397, 402 (App. Div. 1979)). Mediation is, of course, a more complicated and, at times, more expensive process than is a mere settlement attempt. See R. 5:5-6; R. 1:40-5(b).

The motion judge certainly had the authority to compel the parties to prove they had made an attempt to settle the issue regarding the children's extracurricular activities. He also could have required the parties to submit sufficient financial information to allow him to determine the issue. As the judge said, "[t]he children's expenses for extracurricular activities, if warranted at all, must be made in proportion to the parties income." Indeed, if the parties had not submitted sufficient information, the judge could have found that fact, denied the motion and allowed the motion to be refiled as he did with Lana's after-expense request. Requiring the parties to mediate under the terms of the agreement that did not provide for same was improper. Under these circumstances, we reverse the judge's order requiring the parties to mediate and remand the matter to be considered by the judge.

III.

We agree that the judge's findings, including those related to credibility and Lana's bad faith, "cast doubt upon the realistic possibility of an impartial hearing before the same judge on remand." P.T., 325 N.J. Super. at 221. Our

reasoning in <u>P.T.</u> applies here: "Because the judge has taken a strong (though undoubtedly sincere) view of the merits of this case, we conclude that insuring the appearance as well as the reality of an impartial hearing requires that the case be reassigned." <u>Ibid.</u>

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

16

A-4738-17T2