656 A.2d 841

S.M., PLAINTIFF–APPELLANT, v. A.W.,
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted January 24, 1995—Decided April 17, 1995.

Before Judges PRESSLER, CONLEY and NEWMAN.

*Gelman & Gelman,* Esqs., attorneys for appellant (*Debra F. Schneider,* on the brief).

*Les Bierman,* attorney for respondent.

The opinion of the court was delivered by

NEWMAN, J.S.C. (temporarily assigned).

Plaintiff, S.M., the maternal grandmother of L.M., appeals from an order continuing the custody of L.M.'s foster mother, defendant A.W. This appeal raises issues concerning the appropriate standards to be considered by the court in applying a "best interest" test where a grandparent seeks custody of her grandchild in order to reunite with the child and to reunite the child with her own siblings. We are satisfied that the correct standards were not followed and reverse.

The facts are these. L.M. was born on July 4, 1991. Her two brothers, T.M. and J.M., live with plaintiff. At the time of the plenary hearing on October 13, 1993, T.M. was 15, J.M. was 4, L.M. was 2 and plaintiff was 54 years old. Both T.M. and J.M. have lived with plaintiff since their birth. The children's mother, plaintiff's daughter, also lived with the plaintiff, except for a brief period of time when she moved out with L.M. In February, 1992 when L.M. and her mother were living in an apartment, L.M.'s

mother left her with a 14 year old babysitter for several days. In the mother's absence, L.M. was burned and hospitalized.

Criminal charges of endangering the welfare of L.M. were brought against her mother. She was convicted, sentenced to 364 days in jail as a condition of a 5 year probation and was incarcerated from sometime in February, 1992 until July, 1992.

DYFS intervened and placed L.M. with Jo Ellen Crawford, whom the grandmother knew. L.M. lived with Ms. Crawford from February, 1992 until July 9, 1992. In July, 1992, defendant, learning of the child through a mutual friend of hers and plaintiff, offered to provide foster care for L.M. DYFS barred plaintiff from having L.M. under her care at the same time that L.M.'s mother lived under the same roof. Plaintiff was put in a position of choosing between her own daughter who had just been released from jail without a place to live and her granddaughter. Satisfied with the temporary provision for L.M. offered by defendant, plaintiff elected to house her own daughter and defendant assumed the care for the granddaughter.

On September 4, 1992, an order for custody was signed by Judge Krafte, placing L.M. with defendant, ostensibly with the mother's consent. L.M. visited with plaintiff and siblings as arranged pursuant to the court order.

On February 19, 1993, L.M.'s mother died of emphysema. On March 1, 1993, plaintiff filed a petition in the Family Part of the Superior Court seeking custody of her granddaughter for the reason that her daughter "just recently passed away and I would like to raise my granddaughter."

A probation investigation was ordered by the court on March 24, 1993 which then provided as well for supervised visitation. Custody was continued with defendant. A diagnostic evaluation was ordered on May 18, 1993. A family services evaluation was prepared. A plenary hearing was held. No expert testimony on psychological bonding was furnished at the hearing.

The family evaluation done by DYFS saw both the grandmother and the foster mother as offering acceptable homes for L.M. The grandmother lived in a six room apartment in a two family house owned by her brother in Paterson. She had worked for the past 6 years in the housekeeping department of Barnet Hospital. She was viewed as a warm and sincere woman, anxious to have her granddaughter returned to her. She received welfare assistance of $322 monthly for L.M.'s brothers. The grandmother believed it essential that the three children be raised together since they are natural brothers and sister. L.M.'s older brother was a student at East Side High School, appeared respectful of his grandmother and a rather intelligent young man. The younger brother was not home at the time of the interview.

Defendant was also interviewed by the evaluator. She owns a small grocery store in Englewood where she also lives in her own home. The child was at defendant's grocery store when the evaluation took place. She acted friendly and appeared to enjoy the activities taking place in the retail establishment. Defendant told the evaluator that when she first spoke to plaintiff, plaintiff did not welcome the responsibility of raising L.M. for the avowed reason that she already had five children and was tired of child-drearing. The evaluator also noted a bond between the child and defendant.

The evaluator interviewed Kathryn Brown, the DYFS worker assigned to this matter. She indicated that the foster mother would be receiving $170 per month for L.M. along with a retroactive payment, although no money had been paid to her to date. According to Ms. Brown's supervisor, DYFS did not make a recommendation on custody. Both situations were considered very good and the matter was very reluctantly left up to the court. The evaluation made the following observations:

It was indicated that DYFS is highly aware of the necessity and beneficial effects of maintaining families together. It is their position that they will, under all circumstances, try to maintain the family structure and keep children with blood relationships as much as possible.

It was stated that in the long run, the best interests of the children seemed to be gained from assisting families becoming functional rather than separating the members of that family.

The family service evaluation report also interviewed L.D., the person who would provide babysitting services for L.M. in the event the grandmother received custody. A home visit reported a favorable impression of L.D. as a caretaker. L.D. and her husband both came from very large families, were used to having children around the house and were adept at meeting the needs of young children. Her husband, a bus driver with New Jersey Transit, also came home during the day and enjoyed helping with the children.

The team recommendation of the psychologist and clinical social worker was that custody remain with the foster parent. The team also recommended that the grandmother be allowed consistent regular but limited unsupervised visitations which should include interactions between L.M. and her two brothers. The visitation was complicated by a lack of transportation and specific decisions regarding this were to be addressed. The clinical psychologist viewed plaintiff as well meaning but very simple and dependent. She was characterized as having difficulty raising her own children, a number of whom were arrested, one for a murder charge, and only two of her children graduated high school. She was seen as evasive in response to questions on whether her children used drugs. The grandmother acknowledged that L.M.'s mother had used drugs, but not in her presence.

The impression made by the foster parent was more favorable. She was viewed as the psychological parent for L.M. She raised a nephew who had past legal difficulties but who now had a stable family life. She appeared concerned and loving toward the child and financially able to take care of all medical needs. To a large extent, the clinical social worker's evaluation mirrored the clinical psychologist's report.

The hearing judge found that L.M.'s best interests would be served by remaining in defendant's custody. He gave the following reasons:

1. L.M. seems to have bonded with defendant and considers her to be her psychological mother.

2. Defendant has and will be able to provide L.M. with a more stable home and neighborhood environment and she'll be better able to provide for L.M.'s intellectual development and further educational needs.

Recognizing that L.M. should develop and have an ongoing relationship with her grandmother, brothers and extended family, the hearing judge ordered extensive visitation in the preschool years, spending a week per month after L.M. begins school and every other weekend thereafter. One half of her school vacations were to be spent with her grandmother.

Under *N.J.S.A.* 9:2–9, a person interested in the welfare of a child where the known parent is dead and the other cannot be located, may institute an action in the Superior Court, Chancery Division, Family Part, in the county where such minor child has resided for the purpose of securing custody. The maternal grandmother qualified as such an interested person and had standing to bring this action to have her granddaughter returned to her. We are convinced that the hearing judge erred in continuing custody with the foster parent.

While the Supreme Court has frequently considered the best interest test in the context of a custodial dispute between natural parents, it has not yet addressed the best interest standard when the custodial claim is made by one who is not a parent. *See e.g., Matter of Baby M,* 109 *N.J.* 396, 445, 537 *A.*2d 1227 (1988). This court, however, has addressed such custody claims in a variety of contexts. *See, Todd v. Sheridan,* 268 *N.J.Super.* 387, 633 *A.*2d 1009 (App.Div.1993) (best interest standard applied in custody action between maternal grandparents and natural father); *Zack v. Fiebert,* 235 *N.J.Super.* 424, 563 *A.*2d 58 (App.Div. 1989) (no single standard applicable in every third party custody case, but best interest test applied where natural parent was involved or one who stands in the shoes of a parent); *Matter of D.T.,* 200 *N.J.Super.* 171, 491 *A.*2d 7 (App.Div.1985) (unfitness of natural parent has to be established in custody proceeding between natural father and maternal grandparents); *E.T. v. L.P.,*

185 *N.J.Super.* 77, 447 *A.*2d 572 (App.Div.1982) (custody proceeding involving natural parent versus paternal aunt applied a hybrid standard requiring a showing by clear and convincing evidence of unfit mother and child's best interest); *Hoy v. Willis,* 165 *N.J.Super.* 265, 398 *A.*2d 109 (App.Div.1978) (best interest standard was applied where the paternal aunt was viewed as the child's psychological mother). The general best interest standard is clearly applicable in this custody dispute between the maternal grandmother and the unrelated foster parent.

 While a number of different factors inform the best interest standard, it is evident that the strong presumption favoring the natural parent's right to the custody of his or her minor children best serves the child's best interest by placing the child with his or her natural parent. *See, Matter of D.T., supra,* 200 *N.J.Super.* at 177, 491 *A.*2d 7. Likewise, we have recognized that a third party who stands in the shoes of a parent should be accorded the status of a natural parent in the quest for custody. *See, Zack v. Fiebert, supra,* 235 *N.J.Super.* at 432, 563 *A.*2d 58. A maternal grandmother who has been found fit is presumptively the suitable and biological replacement for a deceased daughter in respect of custody of the granddaughter who has no acknowledged or known paternal relationship. In these circumstances, the strong family affiliation between the grandmother and granddaughter must be a crucial factor in the best interest determination.

 We note further our Legislature has expressly recognized the status of grandparents. Under *N.J.S.A.* 9:2–7.1, a grandparent residing in the state is permitted to make application for an order of visitation. The statute specifically provides that such visitation "is in the child's best interest if the applicant had, in the past, been a full-time caretaker for the child". *N.J.S.A.* 9:2–7.1c. It is not accidental that the legislature has seen fit to insure that grandparents have a statutory mechanism to enforce a right on their part to have access to their grandchildren. It represents part of a favored public policy that grandparents are in a special

relationship to their grandchildren. *See generally, Mimkon v. Ford,* 66 *N.J.* 426, 332 *A.*2d 199 (1975).

In addition to the grandmother's unique relationship to her own granddaughter, the child's brothers are already living with and in the custody of the grandmother. The sibling relationship is another factor that has to be weighed in the custody mix. Returning the granddaughter to the grandmother's care completes the reunification of the remaining family unit. *See, Matter of Guardianship of J.C.,* 129 *N.J.* 1, 7–8, 608 *A.*2d 1312 (1992). In the long run, the common sense notion that blood relatives are most likely to look out for one another's interests in good times and bad is well founded and supports the reunification objective. *See, Matter of Welfare of D.L.,* 486 *N.W.*2d 375, 380 (Minn.1992), *cert. denied sub nom.,* —— *U.S.* ——, 113 *S.Ct.* 603, 121 *L.Ed.*2d 539 (1992).

The role of a foster parent also has to be kept in perspective. The foster care situation is viewed in this state as a temporary situation. We said as much in *W.C. v. P.M.,* 155 *N.J.Super.* 555, 565, 383 *A.*2d 125 (App.Div.1978), *certif. denied,* 75 *N.J.* 606, 384 *A.*2d 836 (1978):

Similarly in New Jersey the legislative policy emphasizes the temporary characteristic of foster care, and the ideal goal of the return of foster care children to their natural parents would be subverted if the right of retention in the foster home was dependent upon the question of the best interest of the children. Foster care is designed as a temporary palliative to care for children whose parents are unable to do so for one or more reasons; and in many cases, as herein, it comes about as a result of voluntary consent by the parent. To surround a foster parent with greater rights than those contemplated by the legislative system would permit them to interfere with the delegated function of the Division (DYFS) and the paramount right of the parent to the re-entry of the children into the natural family unit.

We continued by saying:

In fact, such indulgence toward foster parents would tend to destroy the entire system of foster care by creating an impediment to the voluntary consent of an unfortunate parent who cannot care for their children because of health, economic reasons or other infirmities, but who nevertheless has a sincere interest in the welfare of their children and their ultimate return to the family fold. Such an approach would also obliterate the well-settled dichotomy in the legislative system of our State between the placement of a child for adoption and the placement for

> foster care. *See, N.J.S.A.* 30:4C–26.1. In the former, the parties know and expect the termination of parental rights. In the latter, the parties know and expect temporary placement looking toward return of the children to the natural parent.
>
> [*W.C. v. P.M., supra,* 155 *N.J.Super.* at 565, 383 *A.2d* 125.]

The temporary nature of foster care was contemplated in this factual setting. L.M.'s custody would not have been reposed in defendant if the grandmother was in a position to care for the child. Unfortunately, the grandmother elected to help her own daughter who had just been released from prison and was barred by DYFS from having the granddaughter within the same household in which her own mother was living. If the mother had other accommodations available to her, the granddaughter would have been returned to the grandmother's care and been in the company of her two brothers. The return of L.M. to the household was the ultimate goal either at the end of the mother's satisfactory completion of her probation or, as it turned out, upon her untimely death.

The proper role of foster care and the paramount interest to achieve family reunification whenever possible calls for a presumption of custody in favor of a fit grandmother. Under the circumstances presented, we hold that the maternal grandmother stands in the shoes of her deceased daughter in relation to L.M. and should be accorded the status of a natural parent in seeking custody.

Accordingly, we reverse the order appealed from and remand for entry of an order awarding immediate physical custody of L.M. to plaintiff. On application by defendant, the court may consider whether any brief transitional period of visitation by her is necessary in the child's best interest.

Reversed and remanded for entry of an order consistent with this opinion.