# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3055-20

C.S.,

    Plaintiff-Appellant,

v.

J.B. and A.Y.S.,

    Defendants-Respondents.

_____

Submitted September 14, 2022 – Decided October 21, 2022

Before Judges Vernoia and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FD-11-0851-20.

Bernstein & Manahan, LLC, attorneys for appellant (James P. Manahan, on the brief).

Matthew J. Platkin, Acting Attorney General, attorney for respondent New Jersey Division of Child Protection and Permanency (Sookie Bae-Park, Assistant Attorney General, of counsel; Jessica A. Prentice, Deputy Attorney General, on the brief).

PER CURIAM

In this appeal, plaintiff, C.S. (Cindy),[1] challenges a May 19, 2021 Family Part order that denied her application for custody of her then-four-year-old grandson J.B. (Junior), and instead maintained custody of Junior with the Division of Child Protection and Permanency (Division), which had previously removed Junior from the care and custody of his biological parents, A.Y.S. (Annie) and J.B. (John).[2]  We affirm.

I.

In addition to Junior, Annie is the mother of J.G. (Jane).  K.G. is Jane's father.[3] At the time of the trial court proceedings, Jane was twelve years old.[4] According to the parties, in early 2019, the court granted the Division both legal

---

[1]  In order to protect the confidential nature of records pertaining to the placement of the child at issue in this appeal we use pseudonyms in lieu of actual names.  R. 1:38-3(d)(13).

[2] As confirmed by the court, John was served with the FN complaint and notified of the proceedings.  He neither attended the plenary hearing held on May 18, 2021, see infra at p. 8-13, nor has he participated in this appeal.

[3]  K.G. similarly has not participated in this appeal.

[4]  The facts detailed in our opinion are based upon the uncontested facts contained in the parties' merits briefs and the limited record provided.

A-3055-20

and physical custody of Junior under the Title Nine FN docket.[5]  At the time the Division was granted custody of Junior, Jane had been in Cindy's physical custody for over a year.

Cindy obtained physical custody of her granddaughter after she filed a pro se application under the FD docket, and without Division involvement, in 2017. According to Cindy, she sought custody of Jane because Annie "had a history of abandoning [Jane] [and] leaving [her] with other persons and not returning for days and because of suspected illegal substance abuse."  She also was concerned that Jane "might be assaulted or otherwise harmed by those taking her into custody."

---

[5] The Family Part addresses and resolves various matters designated by specific docket types.  As our Supreme Court has explained:

> FM, which consists of divorce, marriage nullity, and separation maintenance matters.  Other docket types include:  FD, which consists of child custody, visitation, child support, paternity, medical support, and spousal support in non-divorce matters; FN, which consists of abuse and neglect matters; FG, which includes termination of parental rights matters; FC, which consists of child placement review matters; FL, which consists of kinship legal guardianship matters; and FV, which consists of domestic violence matters.
>
> [N.J. Div. of Youth & Fam. Servs. v. I.S., 214 N.J. 8, 22 n.3 (2013).]

When the court granted the Division custody of Junior, Cindy expressly declined to be considered as a placement for him. She was accordingly dismissed from the FN litigation at her urging, but not before being notified that Junior was placed in a non-relative resource home.

The FN litigation involving Junior continued until June 2020, when the Division dismissed the matter after it filed a Title Thirty guardianship complaint under the FG docket in which it sought to terminate Annie and John's parental rights as to Junior only. Despite her initial refusal to be considered as a placement for Junior, Cindy sought custody of him over a year later by filing a complaint, again under the FD docket, in which she named only Annie and John as defendants.

In a certification provided to the court in support of her custody application, Cindy explained that before being placed in a resource home, Junior had a "warm and loving relationship with [her] and his extended family including aunts, uncles and cousins, as well as his sister." She believed that it would be "beneficial" for Junior to be raised with Jane and understood that Junior had recently asked about Jane, suggesting there was "love and affection in that relationship."

4

Cindy further explained that the court previously advised her that she would be an acceptable custodial candidate for Junior if she could establish a suitable residence. Cindy maintained that she did so and could provide "all the necessities of food, clothing and shelter for [Junior]." She also noted her adult son lives with her and would be available to assist in meeting Junior's needs.

Cindy again stated that Junior would benefit from resuming his relationship with his biological family, and explicitly denied allegations that she failed to cooperate in structured visitation between Junior and Jane. Rather, she described that "all such attempts were made at inconvenient times when [she] was not available."

Finally, considering the amount of time Junior had been removed from his biological family, Cindy requested the court urgently grant her custody application. Alternatively, she requested the court consider her as a resource parent and place Junior in her home immediately.

The court subsequently scheduled a number of hearings, all conducted virtually in light of the COVID-19 pandemic. After each conference, the court entered an order which noted that Cindy's application would be considered in conjunction and coordination with the Division's FG matter, which the court was also handling.

 A-3055-20

In a December 4, 2020 order, the court determined Cindy's custody application would be resolved after a plenary hearing and ordered all discovery to be completed by January 20, 2021. As detailed below, the court ultimately conducted that hearing on May 18, 2021.

On March 16, 2021, Junior's Law Guardian attempted to schedule a psychological and bonding evaluation for Cindy, Annie, Junior, and his resource parents. Rather than participate in that evaluation, Cindy moved for a protective order, in which she sought to bar "any agency review, evaluation, or examination of [her] fitness as a potential custodial parent." She specifically requested that the court enter such an "order so that [she] does not have [to] submit to an evaluation or examination by any expert in this matter but rather have the matter proceed to plenary hearing without such examination."

In her supporting certification, Cindy contended it was "improper for the agency to arrange or conduct an examination, evaluation or analysis by any expert of [her] as a potential custodial parent as [she] [is] not part of the agency case or proceeding." Cindy further noted she currently has custody of Jane and believed it is in Junior's "best interests … that he live with [Cindy] at [her] residence . . . along with his sibling and that the agency return [her] grandson to his biological family."

A-3055-20

The court conducted a hearing on April 6, 2021 with respect to Cindy's motion and denied her request for a protective order. In an order entered that day, the court directed Cindy "to attend the evaluations scheduled by the Law Guardian . . . [and] . . . provide confirmation of her attendance to the Law Guardian prior to the date . . . [or] a missed appointment fee would be incurred."

Cindy failed to appear at the scheduled appointment. The court accordingly held another virtual hearing on April 13, 2021 to address her noncompliance and entered an order the next day requiring Cindy to notify "all counsel by April 22, 2021 of her intention to appear or not appear for the Law Guardian's scheduled psychological and bonding evaluations." Cindy failed to comply with the court's April 14th order and never appeared for the scheduled evaluations.

As noted, the court conducted a plenary hearing on May 18, 2021 to address Cindy's outstanding custody application.[6] At the plenary hearing, Cindy, Annie, Annie's sister, L.S., and Annie's brother, I.J., testified in support of Junior's placement with Cindy or another family member. Division

_____

[6] Annie's brother, I.J., also filed a complaint under the FN docket for custody of Junior. The court denied his application at the conclusion of the May 18, 2021 plenary hearing. I.J. has not appealed that decision.

caseworker Stephanie Holliday testified in opposition. Junior's Law Guardian also opposed Cindy's motion but did not call any witnesses.

Cindy explained it would be in Junior's best interests to be placed with her and raised with Jane. She failed, however, to provide any details or evidence with respect to her employment or income sources, instead electing to summarily state she would be able to meet Junior's needs. With respect to visitation with Junior, Cindy acknowledged that despite being offered visitation by both the Division and the resource parents, she had visited with Junior only one time since his removal two years earlier.

When the Division attempted to cross-examine Cindy regarding Junior and her suitability to care for him, she refused to answer counsel's questions, and instead asserted her rights under the Fifth Amendment as follows:

> [DIVISION COUNSEL]: I want to be clear, since the child was removed you have seen the child one time, is that your testimony that you've seen [Junior] one time?
>
> [CINDY]: I plead the Fifth.
>
> [DIVISION COUNSEL]: Okay. Who's the father of [Junior]?
>
> [CINDY]: I plead the Fifth.
>
> [DIVISION COUNSEL]: Now, does [Annie] invite you to her weekly visitations with [Junior]?

A-3055-20

[CINDY]: I plead the Fifth.

[. . .]

[DIVISION COUNSEL]: . . . [W]hat is your assessment of … the possibilities of [Junior's] negative reaction to move from the resource parent and placed --

[CINDY]: I plead the Fifth.

Annie testified that she wanted either Cindy or I.J., to have legal and physical custody of Junior. L.S. stated that she too preferred Cindy to care for Junior. For his part, I.J. stated that he believed Junior should be with him, or Junior's extended family.

Prior to Holliday's testimony, the Division attempted to submit into evidence a redacted evaluation of Junior and Annie conducted by Dr. David Brandwein. Annie, however, apparently had not had an opportunity to review the redacted report, and the court accordingly denied the Division's request to admit the report into evidence.

Holliday confirmed that Cindy initially declined to be considered as a resource placement for Junior and also refused to engage in the licensing process for his placement, a requirement under the New Jersey Resource Family Parent Licensing Act, N.J.S.A. 30:4C-27.3 to 27.15. She also stated Junior's resource

9

parent regularly communicated with Cindy, and cooperatively engaged with the Division to arrange sibling visits between Junior and Jane.

Holliday also stated that despite the Division's encouragement, Annie had not invited Cindy to accompany her on her visits with Junior. She further explained that around March or April 2021, Cindy notified the Division that she would no longer communicate with the Division or Junior's resource parent, upon the advice of her lawyer. Holliday also informed the court that Cindy refused to provide any "collaterals" regarding Jane, which she described as documents that address, among other issues, a child's educational and medical needs.

Junior's Law Guardian did not call any witnesses, but expressed his opposition to Cindy's custody application, noting Junior was happy in his resource home and wished to be adopted. The Law Guardian also stressed Cindy's complete disregard for court-ordered evaluations, and her failure to provide any corroborating evidence supporting her application, such as her finances, residence, and plans to mitigate any potential harm to Junior if he is removed from the care of his resource parents.

A-3055-20

At the conclusion of the hearing, the court considered the factors enumerated in N.J.S.A. 9:2-4[7] and issued an oral decision that denied Cindy's custody application and dismissed her FD complaint. The court stressed it had significant concerns regarding Cindy's and I.J.'s initial failure to make themselves available as a resource placement for Junior, and Cindy's later refusal to engage in scheduled evaluations.

With respect to the N.J.S.A. 9:2-4 factors, the court weighed Cindy's ability to agree, communicate and cooperate in matters relating to Junior, and found that Cindy's failure to engage in any expert evaluations, especially those requested by Junior's Law Guardian, evidenced her unwillingness to communicate and cooperate in matters about Junior. The court stated that it did

---

[7] The fourteen factors listed in N.J.S.A. 9:2-4 are: (1) the parents' ability to agree, communicate and cooperate in matters relating to the child; (2) the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; (3) the interaction and relationship of the child with its parents and siblings; (4) the history of domestic violence, if any; (5) the safety of the child . . . ; (6) the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; (7) the needs of the child; (8) the stability of the home environment offered; (9) the quality and continuity of the child's education; (10) the fitness of the parents; (11) the geographical proximity of the parents' homes; (12) the extent and quality of the time spent with the child prior to or subsequent to the separation; (13) the parents' employment responsibilities; and (14) the age and number of the children.

not weigh factor two against Cindy despite her decision to visit Junior only once since his removal in light of the difficulties attendant to visitation. The court, however, weighed factor three against Cindy and explained that although sibling visitation was encouraged, it was suspended for approximately two or three months by Cindy. The court, therefore, noted that such behavior "show[ed] a lack of a desire to interact with [Junior's] sibling[]."

The court weighed factors seven through nine and twelve through thirteen against Cindy as she failed to introduce sufficient testimony or evidence outside of "basic statements" detailing how Junior's needs would be met, what his home environment would be like, or even where he would attend kindergarten if placed in her care. She also failed to adequately describe the extent and quality of the time spent with the Junior prior to or subsequent to his removal, or her employment responsibilities. The court also considered factors four, five, six, ten, eleven, and fourteen but determined they did not affect the court's best interests analysis.

In denying Cindy's application the court reasoned:

> [The court] . . . find[s] that [Cindy] did not carry [her] burden of proof as to whether [she] should have custody of [Junior]. Again, [the court] reviewed the factors set forth in N.J.S.A. 9:2-4, and [it] did not find that there's sufficient evidence that the [c]ourt disrupt what is happening, especially in the context of this case where

12

there's an FD case and where's there [is] [c]ourt oversight over the placement decisions made by [the Division].

The court stated, however, that "the game [was] not over" as the FG litigation was still pending and Cindy could still consent to an evaluation to be considered as a placement for Junior.[8] The court entered a conforming order memorializing its custody determination and this appeal followed.

II.

Before us, Cindy contends that the court abused its discretion in denying her custody application and when applying the N.J.S.A. 9:2-4 factors, particularly in light of the fact that Jane has been in her custody for nearly two years without incident, and Junior's mother consented to her custody of him. She also argues that the proceedings were fundamentally flawed because the court took an excessive amount of time to adjudicate the matter due to delays related to COVID-19, resulting in Junior developing a bond with his resource parents.

---

[8] We take judicial notice, under N.J.R.E. 201(b)(4), that the court terminated Annie and John's parental rights as to Junior in a June 27, 2022 opinion and order. See N.J. Div. of Child Prot. & Permanency v. A.S., No. FG-11-37-20 (Ch. Div. June 27, 2022) (slip op. at 114).

In addition, Cindy contends the court erred in failing to develop a plan that would allow Junior to be reunited with his biological family. Relying on S.M. v. A.W., 281 N.J. Super. 63, 71 (App. Div. 1995), and L. v. G., 203 N.J. Super. 385, 395 (Ch. Div. 1985), Cindy asserts that New Jersey has a strong policy goal of establishing and nurturing sibling relationships. Similarly, Cindy relies on N.J.S.A. 9:6B-4(b) and (d) for the proposition that a child placed outside his home has the right "[t]o the best efforts of the applicable department to place the child in the same setting with the child's sibling if the sibling is also being placed outside his home." In failing to consider properly these cases and statutory authorities, Cindy argues the court failed to weigh properly the sibling relationship when reaching its custody determination. We disagree with all of these arguments.

III.

We accord "great deference to discretionary decisions of Family Part judges[,]" Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (citations omitted), in recognition of the "family courts' special jurisdiction and expertise in family matters . . . ." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). We are bound by the trial court's factual findings so long as they are supported

14

by sufficient credible evidence. N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Hitesman v. Bridgeway, Inc., 218 N.J. 8, 26 (2014) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Generally, when a third party seeks custody against a legal parent, a two-step analysis is conducted. K.A.F v. D.L.M., 437 N.J. Super. 123, 134 (App. Div. 2014). First, the court must determine "whether the presumption in favor of the legal parent is overcome by either a showing of 'unfitness' or 'exceptional circumstances.'" Ibid. (quoting Watkins v. Nelson, 163 N.J. 235, 247, 254 (2000)). "It is only after that presumption has been rebutted that the court proceeds to the determination whether awarding custody or other relief to the third party would promote the best interests of the child." Ibid.

"In custody cases, it is well settled that the court's primary consideration is the best interests of the children." Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007) (citing Kinsella v. Kinsella, 150 N.J. 276, 317 (1997)). In making the determination, a "court must focus on the 'safety, happiness,

physical, mental and moral welfare' of the children." Ibid. (quoting Fantony v. Fantony, 21 N.J. 525, 536 (1956)). "In issues of custody and visitation '[t]he question is always what is in the best interests of the children, no matter what the parties have agreed to.'" Ibid. (quoting P.T. v. M.S., 325 N.J. Super. 193, 215 (App. Div. 1999)). When determining what custodial arrangement will best meet the child's best interests, the court is required to examine, at a minimum, the fourteen factors set out in N.J.S.A. 9:2-4. D.A. v. R.C., 438 N.J. Super. 431, 450 (App. Div. 2014) ("determining what custodial arrangement is in the best interest of a child requires the Family Part judge to apply the statutory factors outlined in N.J.S.A. 9:2-4 . . . and reach a conclusion that is supported by the material factual record.").

Further, in evaluating the best interests of the child, a "sibling relationship is another factor that has to be weighed in the custody mix." S.M., 281 N.J. Super. at 71. On this point, our Supreme Court has stated, "[c]ase law and the literature make clear that we cannot underestimate the value of nurturing and sustaining sibling relationships." N.J. Div. of Youth & Fam. Servs. v. S.S., 187 N.J. 556, 561 (2006). Recognition of sibling rights, however, is not unfettered as the rights of children to maintain relationships with their siblings is

conditioned on the best interests determination. In re C.R., 364 N.J. Super. 263, 278 (App. Div. 2003).[9]

Applying these principles, we discern no abuse of discretion in the court's decision denying Cindy's request for custody of Junior. Here, Cindy, as a third party, sought custody under an FN application, during a period the Division maintained legal custody of Junior and was intimately involved in his care and supervision. The parties never disputed before the court, and have not disputed before us, that Junior's parents were unable to care for him at the time of his removal or the plenary hearing. Nor have they challenged the court's finding as stated in an order issued after a testimonial summary proceeding in the FN litigation that, "the family is in need of the Division's services for the best interest of the children due to continued concerns and instability."

We also have no reason to disturb the court's findings under N.J.S.A. 9:2-4 as they are supported by sufficient, credible evidence in the record. As the court determined, Cindy initially declined to be a placement for Junior, and only

_____

[9] A leading commentator contends, however, that "[d]espite the holding in S.M. v. A.W., a private third-party custody action is not appropriate today if there is an order granting custody, care or supervision of the child to DCCP. Rather all custody determinations in that case are made by DCPP with judicial oversight." Robert A. Fall & Curtis J. Romanowski, Child Custody, Protection & Support § 22:4 (2022).

visited Junior once during the two years since he was placed with his resource parents. Cindy also refused to participate in scheduled and court ordered evaluations by the Division and Junior's Law Guardian. She further declined to partake in any requirements necessary to become a resource parent for Junior, such as a home assessment. Finally, she failed to provide the court with detailed information necessary to confirm she had the resources and capabilities to care for Junior.

As to Junior's placement apart from Jane, we acknowledge the general preference of the courts to keep siblings together when it is able to do so, S.M., 281 N.J. Super. at 71; N.J.S.A. 9:6B-4(b) and (d), but any such placement must ultimately be conditioned on Junior's best interests. We are satisfied that the court properly considered the proofs before it and determined that Cindy failed to establish it was in Junior's best interests to transfer custody to her from the Division notwithstanding that she had custody of Jane.

We also reject Cindy's reliance on S.M. v. A.W. as it is factually distinguishable. In that case, we reversed a trial court's order granting custody to the resource parents over a maternal grandmother and in doing so held, "[t]he proper role of foster care and the paramount interest to achieve family reunification whenever possible calls for a presumption of custody in favor of a

fit grandmother." S.M., 281 N.J. Super. at 72. There, however, although the grandmother initially consented to Division placement of her granddaughter, she regularly visited with the child and her siblings during the period of removal. Id. at 66. Further, when the grandmother ultimately applied for custody, she willingly participated in several assessments to establish that her home was acceptable, as well as diagnostic and family services evaluations. Id. at 66, 67. Therefore, the court found that "under the circumstances presented" the grandmother "[stood] in the shoes of her deceased daughter in relation to [the child] and should be accorded the status of a natural parent in seeking custody." Id. at 72.

Unlike in S.M., as noted, Cindy visited Junior only once during his period of removal. Moreover, because of her refusal to participate in the necessary Division assessments or evaluations, provide supporting collaterals, or respond to the Division's reasonable inquiries during the plenary hearing, Cindy failed to establish it would be in Junior's best interests for custody to be transferred to her.

We also reject Cindy's argument that the court improperly delayed resolution of her custody application thereby permitting Junior to develop a bond with his resource parents, which would not have occurred had the court

promptly resolved the custody application in her favor. First, the court: expressly did not base its decision, in whole or in part, on any bond that may have developed between Junior and his resource parents; specifically denied the Division's request to admit the report of Dr. Brandwein; and expressly declined to consider the Law Guardian's unsupported assertions regarding Junior's wishes. Second, Cindy did not dispute that she visited with Junior only once after his removal and made no attempt to visit him with Jane.

To the extent we have not specifically addressed any of plaintiff's arguments it is because we have concluded they are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

20