# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0780-23

R.W.,

    Plaintiff-Respondent,

v.

R.B.,

    Defendant-Appellant.

_____

Argued September 11, 2024 – Decided October 10, 2024

Before Judges Mayer and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FV-20-2087-94.

Jeffrey A. Skiendziul argued the cause for appellant (The Tormey Law Firm, LLC, attorneys; Travis J. Tormey, of counsel; Jeffrey A. Skiendziul, on the brief).

Sally A. Sattan argued the cause for the respondent (Community Health Law Project, attorneys; Sally A. Sattan, of counsel and on the brief; Natalie Aguilar, on the brief).

PER CURIAM

Defendant R.B.[1] appeals from a November 13, 2023 order of the Family Part denying his motion to vacate a May 12, 1994 final restraining order (FRO) entered against him pursuant to the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35.  We affirm.

I.

In 1990, the parties started a romantic relationship that lasted four years and produced two children, who are now adults.  They also have a grandchild.

On January 1, 1993, when the parties were in a period of separation, R.W. attempted to pick up their young child from R.B. after a parental visit.  R.B., however, refused to return the child.  He instead questioned R.W. regarding her whereabouts the previous night and grew frustrated when she refused to answer. R.B. eventually put the child in his car without a car seat and drove away. Fearing for the child's safety, R.W. followed R.B. in her vehicle.  R.B. ultimately crashed his car into R.W.'s vehicle.

An ambulance transported R.W. and the child from the accident scene to a hospital.  R.B. was taken into police custody.  R.W. declined to seek a

_____

[1]  We identify the parties by initials to protect the identity of the victim of domestic violence.  R. 1:38-3(d)(9).

A-0780-23

restraining order. After R.B. was released from custody, he went to the hospital and again questioned R.W. about her whereabouts.

On May 15, 1993, R.W. notified police that she believed R.B. had broken into her apartment and stolen several items, including her television, pocketbooks, and all of her clothing. R.W. told police that she and R.B. were having a dispute over whether he could see their child. According to R.W., this incident took place a few days after she returned home to find R.B. hiding in her shower after breaking into her apartment.

On May 3, 1994, believing R.W. was at home with another man, R.B. called R.W. and told her he was on his way to her home to kill her. R.W. called the police. R.B. entered R.W.'s home by breaking the living room window and climbing through. R.W. escaped through the back door as police arrived.

R.W. filed a domestic violence complaint against R.B. based on this incident. She alleged the predicate acts of terroristic threats, burglary, and criminal trespass. R.W. also alleged a history of domestic violence, mentioning only that R.B. pushed her two weeks earlier.

On May 12, 1994, after a hearing, the court entered an FRO against R.B. The parties were unable to produce a transcript of the hearing that resulted in

3

entry of the FRO and the FRO does not indicate which predicate acts the court found had been established.[2]

According to R.W., in 2000, R.B. came to her home with family members intending to confront her boyfriend.  R.W. told R.B. he was violating the FRO and she would call the police if he and his family did not leave.  R.B. and his family members then left.  R.B. denied this incident happened.

In 2010, R.B. published a book entitled "All About the [R.B.'s surname plural]," in which the main character is a man with R.B.'s middle name and surname who kills his wife and her lover "in a fit of rage" when he finds them together.  The character has two daughters with his victim, as does R.B. with R.W.  The character also has a brother named Jamil.  In the book, R.B. thanked his "older brother Jamil for being at his side," referring to a close friend he considers to be his brother.  R.W. has not read the book, but understands the storyline largely mirrors her relationship with R.B.

In 2011, R.B. moved to dissolve the FRO.  The court denied the motion.

---

[2]  The State filed a complaint against R.B. relating to the May 3, 1994 incident, charging him with third-degree burglary, N.J.S.A. 2C:18-2, and third-degree terroristic threats, N.J.S.A. 2C:12-3.  The record does not reflect the outcome of those charges.

A-0780-23

In 2015, R.B. moved to dissolve the FRO. The court denied the motion.[3]

Later in 2015, R.W. saw R.B. at a New Jersey post office during a chance encounter. R.W. froze in place, afraid to interact with R.B. Although R.B. did not immediately leave the post office, he did not talk to R.W. and left when he completed his transaction. R.W. was able to leave without speaking to R.B.

Also in 2015, R.B. was arrested in Maryland for second-degree assault. R.W. produced no proof that R.B. was convicted of that charge.

On February 9, 2023, R.B. filed a motion to dissolve the FRO. In a certification, R.B. described his relationship with R.W. as a "short-term dating relationship," and stated they "have no ties to one another," despite the fact that the parties have two adult children and a grandchild in common. R.B. certified that since issuance of the FRO, which he claimed was based on the predicate act of harassment, he has not contacted R.W., directly or indirectly.

He certified the FRO has made it difficult for him to pursue a career in law enforcement, caused his dishonorable discharge from the Navy, and "impeded [his] ability to travel at airports." R.B. certified that he "believe[s]" the FRO would prohibit him from pursuing unnamed volunteering opportunities.

---

[3] Although the trial court did not have the benefit of the transcript of the 1994 hearing that resulted in entry of the FRO, it reviewed the transcripts of the 2011 and 2015 hearings on R.B.'s motions to dissolve the FRO.

A-0780-23

R.B. stated there have been substantial changes in his life since the FRO was entered, given that he moved to another state, married, and "became a father."[4]

R.W. opposed the motion. She submitted a certification contesting the accuracy of many of the statements in R.B.'s certification and expressing her continuing fear of R.B., given his violent history and threat to kill her.

At a hearing on the motion, R.B. admitted that he was dishonorably discharged from the Navy because he lied on his application about his age and "a couple of other things," "fudged some numbers," and did not disclose the FRO. He also conceded that despite being frustrated in his desire to become a law enforcement officer, he earns sufficient income as a truck driver to have purchased two homes, one in Georgia and one in Florida. With respect to his experience travelling, R.B. explained that when he returned from abroad at an airport, security officials separated him and his fiancé, questioned him about the FRO, and asked his fiancé if she was being coerced to travel with R.B. He also testified that he is unable to adopt or foster children or pets and cannot obtain a license to operate a childcare center. R.B. lives in Georgia, but travels to New Jersey periodically to visit his grandmother and two aunts who live in this State.

---

[4]  R.B. later testified that he married in 1995, obtained a divorce in 2006, and thereafter became engaged. R.B.'s reference to becoming a father appears to refer to children born to him after the two children he had with R.W.

R.W. testified that she remained in fear of R.B. She recounted acts of domestic violence preceding entry of the FRO that were raised at the hearings on R.B.'s motions to dissolve the FRO, as well as the 2000 incident when R.B. came to her home with family members to confront her boyfriend.

On November 3, 2023, the court issued an oral opinion denying R.B.'s motion. The court found R.W.'s testimony "very credible," and R.B.'s testimony lacked credibility. The court found R.B. "appeared angry, frustrated by [R.B.'s] testimony and unable to control his emotions" during the hearing. The court also found R.B. displayed a lack of candor in his moving papers by minimizing both his relationship with R.W. and the severity of the predicate acts of domestic violence supporting the FRO. The court also found that R.B. misrepresented the reason for his dishonorable discharge from the Navy.

The court applied the factors set forth in Carfagno v. Carfagno, 288 N.J. Super. 424, 433-34 (Ch. Div. 1995), to determine whether dissolving the FRO was warranted. The court found that the second Carfagno factor – whether the victim fears the defendant – was the most relevant to deciding R.B.'s motion. The court found R.W. credibly testified she feared R.B. and "the extensive history between the parties and the events that unfolded which led to the issuance of the [FRO] . . . and after the [FRO] was issued created an environment

where it is reasonable for anyone who had lived through such events to continue to fear" R.B. Thus, the court concluded, R.W.'s fear of R.B. was objectively reasonable. The court found that R.B.'s demeanor during the hearing and inability to control his emotions even in a controlled setting supported this finding.

In addition, the court found the book R.B. published "reinforce[d]" R.W.'s fear and "minimize[d]" her experience. The court found the book contained a narrative similar to R.W.'s experience with R.B., but with an alternative outcome in which the victim of domestic violence is murdered. Thus, the court found, the book "serves as a constant reminder of threats that were alleged to have existed throughout the relationship and the possibility again that there could have been an alternate or there could be an alternative outcome."

The court also found the parties could have future contact because they have adult children and a grandchild. In addition, the court noted R.B. has connections to New Jersey, where R.W. lives, and continues to visit the State. The court found the parties' chance encounter at the post office was "very limited" and "coincidental," but corroborated R.W.'s testimony that she continues to fear R.B.

A-0780-23

The court also found that although R.B. was never prosecuted for violating the FRO, R.W. credibly testified to his alleged violations of the FRO. The court noted that R.W. testified she was confused about the process for alleging a violation of the FRO and assumed that when she filed police reports regarding R.B.'s behavior she would receive assistance prosecuting R.B., but never did.

The court noted R.B.'s admission he was arrested for assault in 2015, and his relative youth and good health. In addition, the court found R.B. did not abuse substances, has not had counseling, and is not subject to other restraining orders. Finally, the court found R.W. acted in good faith in opposing R.B.'s motion. After weighing these factors, the court concluded that good cause did not exist to dissolve the FRO. A November 13, 2023 order memorialized the court's decision.

This appeal followed. R.B. argues the court: (1) erred when it found he did not establish a change in circumstances warranting dissolving the FRO; (2) misapplied the Carfagno factors; and (3) made findings not supported by adequate, substantial, and credible evidence.

## II.

Our review of a motion to dissolve an FRO is limited. See G.M. v. C.V., 453 N.J. Super. 1, 11-12 (App. Div. 2018). Because of the special jurisdiction

9

and expertise of the judges in the Family Part, "we defer to [their] factual determinations if they are supported by adequate, substantial, and credible evidence in the record." Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). These findings will be disturbed only upon a showing that they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Platt v. Platt, 384 N.J. Super. 418, 425 (App. Div. 2006) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)).

We will not disturb the Family Part's equitable selection of remedies as long as they are made with a rational explanation consistent with the law and the evidence. Milne, 428 N.J. Super. at 197-98 (applying an abuse of discretion standard in reviewing a remedy imposed to enforce an order); see also P.T. v. M.S., 325 N.J. Super. 193, 219-20 (App. Div. 1999). Legal decisions of the Family Part, however, are subject to plenary review. N.J. Div. of Youth & Family Servs. v. R.M., 411 N.J. Super. 467, 474 (App. Div. 2010).

According to the Act:

> Upon good cause shown, any final order may be dissolved or modified upon application to the Family Part . . . but only if the judge who dissolves or modifies the order is the same judge who entered the order, or

A-0780-23

has available a complete record of the hearing or hearings on which the order was based.

[N.J.S.A. 2C:25-29(d).]

"Generally, a court may dissolve an injunction where there is 'a change of circumstances [whereby] the continued enforcement of the injunctive process would be inequitable, oppressive, or unjust, or in contravention of the policy of the law." Carfagno, 288 N.J. Super. at 433-34 (alteration in original) (quoting Johnson & Johnson v. Weissbard, 11 N.J. 552, 555 (1953)). "Only where the movant demonstrates substantial changes in the circumstances that existed at the time of the final hearing should the court entertain the application for dismissal." Kanaszka v. Kunen, 313 N.J. Super. 600, 608 (App. Div. 1998). In considering whether to dissolve an FRO, courts consider the following factors:

> (1) whether the victim consented to lift the restraining order; (2) whether the victim fears the defendant; (3) the nature of the relationship between the parties today; (4) the number of times that the defendant has been convicted of contempt for violating the order; (5) whether the defendant has a continuing involvement with drug or alcohol abuse; (6) whether the defendant has been involved in other violent acts with other persons; (7) whether the defendant has engaged in counseling; (8) the age and health of the defendant; (9) whether the victim is acting in good faith when opposing the defendant's request; (10) whether another jurisdiction has entered a restraining order protecting the victim from the defendant; and (11) other factors deemed relevant by the court.

11

[Carfagno, 288 N.J. Super. at 435.]

Importantly, the Carfagno factors are weighed qualitatively, not quantitatively. Id. at 442. Courts "must carefully scrutinize the record and carefully consider the totality of the circumstances" before dissolving an FRO. G.M., 453 N.J. Super. at 14 (quoting Kanaszka, 313 N.J. Super. at 605).

We have carefully reviewed the record and find no basis on which to reverse the trial court's order. Contrary to R.B.'s arguments, the court considered the evidence of changed circumstances proffered by R.B. The court found that after entry of the FRO, R.B. married, divorced, and became engaged, and had additional children. In addition, the court found R.B. resides in Georgia and visits relatives in New Jersey. The court also considered R.B.'s present age and health. The court's denial of R.B.'s motion was not based on a finding that circumstances had not substantially changed since entry of the FRO. Instead, the court found that after consideration of the Carfagno factors, dissolving the FRO was not warranted, despite the change in circumstances. That decision is well-supported by the record.

Having observed R.B. during the hearing, the court found him to be angry, frustrated by R.W., and unable to control his emotions, even in a controlled environment. In addition, the court found R.B. minimized his violent behavior

12

that resulted in entry of the FRO and noted his admission that he intentionally lied on his application to join the Navy. On the other hand, the court found R.W. credibly testified that she had a reasonable fear of R.B. This finding was corroborated by R.W.'s description of her reaction to having a chance encounter with R.B. at a post office. The record also supports the court's finding that the book published by R.B. contains a narrative that mirrors his relationship and past violent interactions with R.W. and "serves as a constant reminder of threats that were alleged to have existed throughout the relationship and the possibility again that there could have been an alternate or there could be an alternative outcome." The court's findings with respect to the remaining Carfagno factors, its balancing of those factors, and ultimate decision denying R.B.'s motion find sufficient support in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

13