# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2752-23

A.P.,

    Plaintiff-Respondent,

v.

A.T.D.,

    Defendant-Appellant.

_____

Submitted April 30, 2025 – Decided June 6, 2025

Before Judges Mayer and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FV-16-1263-18.

Nicholas J. Palma, Valerie Palma Deluisi, & Associates, PC, attorneys for appellant (Valerie Palma DeLuisi and Nicholas J. Palma, of counsel and on the briefs; Alec Q. Duffy, on the briefs).

A.P., respondent pro se.

PER CURIAM

Defendant A.T.D.[1] appeals from the April 1, 2024 order of the Family Part denying his motion to vacate a March 8, 2018 final restraining order (FRO) entered against him pursuant to the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35.  We affirm.

I.

In February 2018, plaintiff A.P. filed a domestic violence complaint against A.T.D., alleging that on February 4, 2018, he engaged in the predicate acts of harassment, N.J.S.A. 2C:33-4, and criminal mischief, N.J.S.A. 2C:17-3. At the time, the parties were married with two children and pursuing a divorce. A.P. and A.D.T. were police officers with the same department.  A.D.T. was retired and A.P. remained in active service.  In January 2018, A.P. moved out of the marital home because she was afraid A.D.T. was intent on interfering with her position as a police officer.  The complaint also alleged a history of domestic violence that included harassment and physical violence.

At the March 8, 2018 trial, A.P. testified with respect to the following predicate acts.  On February 4, 2018, A.P. returned to the marital home to retrieve her belongings, including parts of her police uniform, which she placed

---

[1]  We identify the parties by initials to protect the identity of the victim of domestic violence.  R. 1:38-3(d)(9).

A-2752-23

in her car. While she was at the home, A.T.D. called A.P. a whore, told her she would end up alone and childless, and said the man with which she was intimately involved was a "pussy boy." The following morning, as A.P. was unloading her possessions from her car, she noticed the word "whore" written across the shoulders on the back of her leather police uniform jacket.

With respect to the parties' history of domestic violence, A.P. testified that in 2017, as their marriage deteriorated, A.T.D. verbally harassed her, both in private and in public, including instances of A.T.D. calling A.P. a whore in front of their teenage son and other parents at high school wrestling matches. A.P. also testified A.T.D. pulled her hair from behind, punched her in the face, and struck her in the eardrum and stomach. A.P. discovered evidence A.T.D. obtained a tracking device and a recording device.

A.P. testified she was fearful of A.T.D. given the intensity and duration of his verbal harassment and history of physical violence. In addition, A.P. testified that when the temporary restraining order (TRO) was entered, A.T.D. resisted the surrender of his firearms. Although the details of A.T.D.'s initial refusal to comply with the TRO were not elicited at trial, A.P. testified that A.T.D. was "willing to spend a week in jail" rather than surrender his weapons.

That behavior made A.P. concerned about what A.T.D. might do if an FRO was not entered.

Shortly after the conclusion of A.P.'s testimony, the court issued an oral decision granting the FRO. The court found A.P. credibly testified with respect to A.T.D.'s verbal statements to her, which the court found to constitute alarming, annoying, and offensively coarse communications made with the purpose to alarm or annoy A.P. Thus, the court concluded A.T.D. engaged in the predicate act of harassment. In addition, the court found A.T.D. damaged A.P.'s work jacket by writing "whore" across the back shoulder area. That act, the court concluded, constituted the predicate act of criminal mischief because A.T.D. purposely and knowingly damaged the property of another.

The court found there was a need for an FRO to protect A.P. from future acts of domestic violence because the parties had a teenage son, who, although then alienated from A.P., was likely to cause the parties to interact in the future. In addition, the court found that in the absence of an FRO, A.T.D. was likely "to continue to execute his program of abusing" A.P.

On March 8, 2018, the court entered an FRO against A.T.D. The FRO permitted A.T.D. to visit his mother, who lived in the same high-rise building in Passaic County as A.P., and to attend to rental units A.T.D. owned in that

4

building. The court directed A.T.D. to access the building only through the basement to limit the likelihood the parties would come into contact.

On July 31, 2023, A.T.D. moved to vacate the FRO. A.P. opposed the motion. In a letter to A.T.D.'s counsel, A.P. stated that A.T.D. repeatedly physically assaulted her during their marriage. In addition, A.P. stated that A.T.D. had violated a court order in their divorce proceeding. She requested an order barring A.T.D. from ever seeking to vacate the FRO again and that "[t]he sooner the human species is rid of the vi[le] variant of men like [A.D.T.] the better it will be for all of humankind."

In addition, A.P. submitted a certification stating that on Mother's Day 2018, after issuance of the FRO, A.T.D. took the parties' children to a church service at A.P.'s place of worship, which was not close to A.T.D.'s home. In June 2018, A.P. observed A.T.D. with his girlfriend at a church near her place of work, which A.T.D. knew A.P. frequented. She also certified that in June 2018, A.T.D.'s girlfriend repeatedly called A.P.'s cellphone and that she received a call from the girlfriend's husband. A.P. certified A.T.D. obtained a TRO against her and offered to withdraw it if she withdrew the TRO then entered against him. A.P. also alleged A.T.D. continued to have ties to New Jersey and

5

was in contact with her niece to obtain information about A.P. She alleged A.T.D. was wealthy and did not need employment to supplement his pension.

At a January 23, 2024 hearing held by the same judge who entered the FRO, A.T.D. adopted as his testimony the following facts recited by his counsel. The parties divorced in December 2018 and A.T.D. moved to Arizona in 2020. He is a permanent resident of that state and has been in a committed relationship with a woman for several years. A.T.D.'s mother died in 2022 and the New Jersey home in which she resided had been sold. A.T.D. inherited an interest in a New Jersey shore home. That property was sold in 2023.

There has been no contact between the parties since entry of the FRO. A.T.D. has not been charged with contempt of the FRO and there is no evidence he has an alcohol or drug abuse history. A.T.D. has never been the subject of a TRO or FRO concerning any party other than A.P. Although not ordered to do so, A.T.D. took a twenty-six-week course at the New Jersey Center for Non-Violence, which he completed in November 2018.

At the time of the hearing to vacate the FRO, A.T.D. was sixty-one years old, in good health, and living on a pension. Because he claimed a need to supplement his pension, A.T.D. obtained a job offer as a shooting range instructor in Arizona, which is consistent with his decades-long experience as a

6

police officer and shooting range instructor. He cannot accept the position without a lawful carry permit, which he cannot obtain because of the FRO. A.T.D. resides with the parties' adult son, who enjoys hunting. The son cannot keep his firearms in the home because of the FRO.[2]

A.T.D. disputes A.P.'s claim he caused her to lose her position as a police officer. To the contrary, according to A.T.D., after entry of the FRO, while A.P. was off duty she called a police officer and had the officer run a computer search on a license plate on a car parked at A.T.D.'s home. A subsequent investigation led to A.P.'s termination as a police officer and placement on pre-trial intervention (PTI) to avoid criminal prosecution.

A.P. testified as follows. Although divorced, the parties continue to dispute child support for their son in a matter pending in the Family Part. A.P. admitted resigning from her position as a police officer and being placed on PTI, but argued the incident was not relevant to her continuing need for protection from A.T.D. In addition, while the FRO was based on the predicate acts of harassment and criminal mischief, A.T.D. physically assaulted her many times

---

[2] The parties' adult children submitted certifications in support of A.T.D.'s motion. They certified they never witnessed A.T.D. assault A.P. and if there was physical contact between the parties during arguments it was the result of A.P. striking A.T.D.

7

during the marriage. A.P. did not report the assaults out of embarrassment because of her position as a police officer.

A.P. contested the genuineness of the offer of employment as a shooting range instructor. She alleged the range owner is a friend of the parties' daughter, suggesting the offer was extended to assist A.T.D. in obtaining firearms. A.P. testified that after she left her position as a police officer she was able to find employment that did not require her to carry a firearm.

A.P. produced copies of A.T.D.'s applications for hunting licenses in Pennsylvania, which she claimed were left anonymously on her mother's doorstep. A.T.D. testified he hunts turkey with a bow and arrow in Pennsylvania each spring. He testified that when Pennsylvania issues a license to hunt with a bow and arrow to a non-resident, it automatically issues licenses to hunt deer with a firearm. He denied having hunted deer with a firearm in Pennsylvania since issuance of the FRO.

A.P. testified A.T.D. continued to use the legal system to harass her and that she feared A.T.D. would kill her if he had access to firearms.

On April 1, 2024, the court issued an oral decision denying the motion. The court applied the factors set forth in Carfagno v. Carfagno, 288 N.J. Super. 424, 433-34 (Ch. Div. 1995), to determine whether dissolving the FRO was

8

warranted. The court found A.P. credibly testified that A.T.D. continues to harass and manipulate her since entry of the FRO. The court accepted as credible A.P.'s certification with respect to A.T.D. attending a church service with the parties' children at A.P.'s place of worship on Mother's Day in 2018. In addition, the court found credible A.P.'s certification that A.T.D.'s girlfriend contacted her repeatedly in 2018. The court accepted A.P.'s certification with respect to A.T.D. obtaining a TRO against her and attempting to leverage it to dismiss the TRO then entered against him.

The court found these acts demonstrate A.T.D.'s intentions and motivation to continue to control, harass, and manipulate A.P. The court noted A.T.D.'s primary motivation for seeking to vacate the FRO was to obtain firearms. The court observed A.T.D. obtained a license to hunt with a firearm in Pennsylvania, even though he is not permitted to possess firearms.

The court found A.P.'s expressions of her continuing fear of A.T.D. to be credible and her testimony on that point was "compelling." The court rejected A.T.D.'s contention that A.P.'s opposition to his motion was made in bad faith.

After weighing the Carfagno factors, the court denied A.T.D.'s motion. An April 1, 2024 order memorialized the trial court's opinion.

This appeal followed. A.T.D. argues the trial court abused its discretion because the Carfagno factors weigh heavily in support of vacating the FRO.

## II.

Our review of a motion to dissolve an FRO is limited. See G.M. v. C.V., 453 N.J. Super. 1, 11-12 (App. Div. 2018). Because of the special jurisdiction and expertise of the judges in the Family Part, "we defer to [their] factual determinations if they are supported by adequate, substantial, and credible evidence in the record." Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). These findings will be disturbed only upon a showing that they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Platt v. Platt, 384 N.J. Super. 418, 425 (App. Div. 2006) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)).

We will not disturb the Family Part's equitable selection of remedies as long as they are made with a rational explanation consistent with the law and the evidence. Milne, 428 N.J. Super. at 197-98 (applying an abuse of discretion standard in reviewing a remedy imposed to enforce an order); see also P.T. v. M.S., 325 N.J. Super. 193, 219-20 (App. Div. 1999). Legal decisions of the

10

Family Part, however, are subject to plenary review. N.J. Div. of Youth & Fam.

Servs. v. R.M., 411 N.J. Super. 467, 474 (App. Div. 2010).

According to the Act:

> Upon good cause shown, any final order may be
> dissolved or modified upon application to the Family
> Part . . . but only if the judge who dissolves or modifies
> the order is the same judge who entered the order, or
> has available a complete record of the hearing or
> hearings on which the order was based.
>
> [N.J.S.A. 2C:25-29(d).]

"Generally, a court may dissolve an injunction where there is 'a change of

circumstances [whereby] the continued enforcement of the injunctive process

would be inequitable, oppressive, or unjust, or in contravention of the policy of

the law." Carfagno, 288 N.J. Super. at 433-34 (alteration in original) (quoting

Johnson & Johnson v. Weissbard, 11 N.J. 552, 555 (1953)). "Only where the

movant demonstrates substantial changes in the circumstances that existed at the

time of the final hearing should the court entertain the application for dismissal."

Kanaszka v. Kunen, 313 N.J. Super. 600, 608 (App. Div. 1998). In considering

whether to dissolve an FRO, courts consider the following factors:

> (1) whether the victim consented to lift the restraining
> order; (2) whether the victim fears the defendant; (3)
> the nature of the relationship between the parties today;
> (4) the number of times that the defendant has been
> convicted of contempt for violating the order; (5)

whether the defendant has a continuing involvement with drug or alcohol abuse; (6) whether the defendant has been involved in other violent acts with other persons; (7) whether the defendant has engaged in counseling; (8) the age and health of the defendant; (9) whether the victim is acting in good faith when opposing the defendant's request; (10) whether another jurisdiction has entered a restraining order protecting the victim from the defendant; and (11) other factors deemed relevant by the court.

[Carfagno, 288 N.J. Super. at 435.]

Importantly, the Carfagno factors are weighed qualitatively, not quantitatively. Id. at 442. Courts "must carefully scrutinize the record and carefully consider the totality of the circumstances" before dissolving an FRO. G.M., 453 N.J. Super. at 14 (quoting Kanaszka, 313 N.J. Super. at 605).

We have reviewed the record and find no basis on which to reverse the trial court's decision. The court had the benefit of hearing testimony from both parties. It determined A.P. credibly testified she remained in fear of A.T.D., who demonstrated attempts to control and manipulate A.P. after issuance of the FRO. While those acts took place in 2018, five years prior to trial, the court found them to be evidence of A.T.D.'s motivation and intent to harass A.P. In addition, the court found A.T.D.'s primary motivation in seeking to vacate the FRO was to obtain firearms and that he obtained a license to hunt with firearms in Pennsylvania after issuance of the FRO. Notably, A.T.D. did not reveal his

12

Pennsylvania hunting license application as part of the evidence submitted in support of his motion to vacate the FRO. When the Pennsylvania evidence was introduced by A.P. at trial, A.T.D.'s counsel stated he was surprised by the evidence. Given our deferential standard of review and the court's careful consideration of the evidence, we affirm.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

13

A-2752-23